A96A1528. TYSON v. McPHAIL PROPERTIES, INC.
(478 SE2d 467)

BLACKBURN, Judge.

This appeal concerns the enforceability of an option to purchase real property. The grantor of the option appeals the trial court's grant of partial summary judgment to the grantee.

In April 1992, McPhail Properties, Inc. (McPhail), acting through its representative Ray McPhail, entered into an option agreement, executed under seal, with Billy V. Tyson. Tyson granted McPhail an option to purchase approximately 2.58 acres of real property at a purchase price of approximately $73,000 per acre, plus interest, which option McPhail could exercise between March 1, 1995, and June 1, 1995. Pursuant to the option agreement, McPhail was permitted to go upon the property for the purpose of performing

any inspections or tests that it deemed necessary prior to exercising its option. Also, the option agreement provided that Tyson could sell the property to a third party provided that McPhail approved in writing the sales contract and all closing documents in connection with such sale. In the event of such a sale, Tyson and McPhail were to equally split the net proceeds.

Tyson refused to permit McPhail to perform tests on the property, and McPhail filed the underlying complaint seeking to enforce its option rights. Tyson contested the validity of the option agreement in his answer. In March 1995, after a hearing, the trial court held the option to be enforceable and entered an interlocutory order prohibiting Tyson from interfering with McPhail's inspections or tests.

By letter, dated May 5, 1995, Tyson sought McPhail's approval for the sale of the property to a third party with McPhail to receive one-half of the difference between the price contained within the option agreement and the contract sales price. This letter stated: "[t]he tender of this contract for approval is done as an offer of settlement and resolution of the issues pending between these parties [with regard to this litigation] and not as an admission or agreement of any kind of the validity of this [o]ption, which . . . Tyson specifically denies." McPhail did not immediately respond. While the option agreement required McPhail's written approval of the sales contract and all closing documents, which Tyson had not obtained, he closed the sale on the morning of May 31, 1995, without any input from McPhail. McPhail, however, notified Tyson of its intent to exercise its option by letter which Tyson acknowledges receiving on May 31, 1995, after the closing.

McPhail then filed an "amendment" to its complaint seeking specific performance of the option agreement and/or damages. The "amendment" outlined events which had occurred subsequent to the filing of the initial complaint, specifically Tyson's breach of the option agreement. McPhail also filed a motion for summary judgment. Tyson then filed his own motion for judgment on the pleadings, asserting that McPhail's "amendment" was improper. In November 1995, the trial court held a hearing on both motions. The trial court denied Tyson's motion and granted McPhail partial summary judgment, holding that the option agreement was enforceable. This appeal ensued.

1. Tyson contends that the trial court erred in considering issues presented in McPhail's "amended complaint." His argument illustrates the difference between amended pleadings under OCGA § 9-11-15 (a) and supplemental pleadings under OCGA § 9-11-15 (d). "The distinction between supplemental pleadings and amended pleadings must be carefully observed. The former concerns matters

which occurred since the date of the original pleading while the latter deals with matters in existence at the time of the original pleading or which ought to be considered to relate back to that time." Gregory, Ga. Civil Practice, § 3-9 (D), citing *St. Joseph's Hosp. v. Nease*, 259 Ga. 153, 154, n. 1 (377 SE2d 847) (1989). Unlike an amended pleading that a party may unilaterally file at any time prior to the entry of a pre-trial order, a party does not have the right to unilaterally file supplemental pleadings. OCGA § 9-11-15 (d) provides that "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading."

All of the additional paragraphs included in McPhail's subsequent pleading address events that occurred after the original complaint was filed. Consequently, the rule of subsection (d) controls such that Tyson should have been given notice and an opportunity to contest the supplemental pleading prior to its filing.

Tyson was not harmed however by McPhail's failure to comply with OCGA § 9-11-15 (d). See *Harrison v. Martin*, 213 Ga. App. 337, 346 (444 SE2d 618) (1994) ("[a] party must show harm as well as error to prevail on appeal"). In *Dept. of Agriculture v. Country Lad Foods*, 226 Ga. 631, 634 (177 SE2d 38) (1970), the Supreme Court found that no harmful error occurred under OCGA § 9-11-15 (d) when a supplemental pleading was filed without prior permission because the adverse party was later given an opportunity to appear before the trial court and argue against the supplement. "Under these circumstances . . . the filing and service of the pleading without prior notice to the defendant was not error harmful to the defendant." Id. at 634 (1). Similarly, in the present matter, Tyson was allowed to appear before the trial court and contest the supplemental pleading. Like the defendant in *Country Lad Foods*, Tyson suffered no harm as a result of this error, and, accordingly, this enumeration is without merit.

2. Tyson contends that the trial court improperly denied his request for additional time to conduct discovery necessary to respond to McPhail's motion for summary judgment. Under OCGA § 9-11-56 (f), a trial court has discretion to grant the party opposing summary judgment a continuance, and the trial court's decision will not be overturned unless that discretion was abused. *Patterson v. Lanham*, 182 Ga. App. 343, 344 (355 SE2d 738) (1987). No such evidence of abuse is present here. The record reflects that no formal discovery — interrogatories, requests to produce, deposition notices — was pursued by Tyson in the three-month interval between his request and the hearing on the motion for summary judgment. *Shmunes v. Gen. Motors Corp.*, 146 Ga. App. 486 (1) (246 SE2d 486) (1978) (trial court properly entertained motion for summary judgment when the record did not evidence that the party requesting the continuance under

OCGA § 9-11-56 (f) had conducted any discovery in the two-month interval between their request and the summary judgment hearing). Moreover, discovery in this case would have lapsed on September 16, 1995. Uniform Superior Court Rule 5.1. Thus, Tyson had two months remaining in the discovery period at the time McPhail moved for summary judgment. In light of the above, Tyson has failed to demonstrate that the trial court abused its discretion in denying his request.

3. Tyson contends that the trial court erred in its determination that the option agreement was supported by sufficient consideration. The option agreement provides: "For and in consideration of Ten Dollars ($10.00) in hand paid by McPhail to Tyson, the sufficiency of which is hereby acknowledged, and in further consideration of the covenants and agreements contained within this [Option] Agreement." Particularly, Tyson argues that certain of the "covenants and agreements" serving as consideration are unenforceable due to vagueness or lack of mutuality. See Division 6. However, in light of Tyson's acknowledgment that the monetary consideration was adequate, there is no need to evaluate the sufficiency of the other consideration. "A contract under seal raises a prima facie presumption of consideration, which is rebuttable. . . . However, any nominal consideration recited in sealed instruments is sufficient as a matter of law." (Citations omitted.) *Jolles v. Wittenberg*, 148 Ga. App. 805, 807 (2) (253 SE2d 203) (1979).

4. Tyson argues that the trial court erred in determining that the acreage price contained within the option agreement is not unconscionably low. In its review of the record, the trial court found the evidence sufficient to establish that McPhail had not taken unconscionable advantage of Tyson,[1] thereby shifting to Tyson the burden of establishing that a disputed question of fact remained as to the unconscionability of the option agreement. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). The trial court entered summary judgment on this issue because Tyson offered no such evidence. Particularly, the trial court noted "[t]he terms of the contract standing alone [over $73,000 per acre] with no comparable figures or evidence of land values is not shocking or even seemingly unfair."

Tyson does not dispute his failure to put evidence of the comparable land values into the record. However, he argues that Ray McPhail unwittingly furnished such evidence by testimony he offered

---

[1] Undisputed evidence in the record reflects that Tyson can read and write; that he was represented by a real estate broker during this transaction; that it was Tyson's broker who first contacted McPhail about purchasing the property not vice versa; that Tyson had the option agreement reviewed by an attorney prior to executing it; and that McPhail made several changes and revisions to the option agreement at the request of Tyson's attorney.

at the hearing on the temporary restraining order. McPhail testified about an earlier transaction whereby he purchased a tract from Tyson for a much larger sum than that contained in the option agreement even though the parcels were in close proximity. This evidence fails to raise a question of fact on the issue of unconscionability because no evidence was offered as to the similarities of the two parcels, and also because Tyson was a party to the earlier transaction and was clearly aware that the nearby property sold for a much larger sum at the time he entered into the option agreement.

5. As outlined above, the option agreement contained a provision whereby Tyson could sell the property to a third party during the term of the option provided that McPhail had given written approval of the sales contract and closing documents. Tyson asserts that, with this provision, McPhail fraudulently induced him to sign the option agreement as McPhail never intended to approve such a sale. The trial court correctly entered summary judgment for McPhail on Tyson's fraud claim.

Even if Tyson could demonstrate that McPhail never intended to approve any such sale at the time it agreed to this provision,[2] Tyson could not prove all the other elements necessary to demonstrate fraud. Particularly, Tyson offered no evidence of how he was damaged by McPhail's alleged misrepresentation. See *Gary v. E. Frank Miller Constr. Co.*, 208 Ga. App. 73, 75 (430 SE2d 182) (1993) (damage is an element necessary to establish fraud). The only time Tyson sought McPhail's approval for sale of the property to a third party was in May 1995 as part of an express "offer of settlement." McPhail's refusal of Tyson's settlement offer is not proper evidence of how Tyson suffered damage as a result of McPhail's fraud. "[P]ropositions made with a view to a compromise are not proper evidence." OCGA § 24-3-37; see also *Citadel Corp. v. Sun Chem. Corp.*, 212 Ga. App. 875 (443 SE2d 489) (1994) (settlement negotiations are not admissible evidence).

Moreover, even if this attempt to obtain McPhail's approval were admissible, it would prove nothing. While the record reflects that McPhail was forwarded a copy of the sales contract, it does not reflect that McPhail received copies of any closing documents as required by

---

[2] Fraud sufficient to void a contract must be based on an intent to deceive that existed at the time the contract was executed. *Mabry v. Pelton*, 208 Ga. App. 891, 893 (432 SE2d 588) (1993). In this case, the property had previously served as a gas station and contained underground storage tanks. Much of the negotiation leading to the option agreement focused on how potential environmental problems associated with the tanks would be investigated and, if necessary, remedied. Due to McPhail's uncertainty about the condition of the property, which is clearly reflected in the option agreement, it would be difficult for Tyson to demonstrate that McPhail had no intent to permit another party to purchase the property at the time the option agreement was executed.

the option agreement. As McPhail never received vital documentation required under the option agreement, it was unable to approve the sale, and its failure to do so is not evidence of fraud.

6. In his final enumeration of error, Tyson points to four different provisions in the contract which he contends render it so vague or lacking in mutuality as to be unenforceable. Because the option agreement purports to be the entire agreement of the parties, Tyson claims the unenforceability of any one of these provisions would render the entire contract void.

First, Tyson argues that the option agreement provides McPhail with such absolute discretion so as to render the contract unenforceable. See *U. S. Fidelity &c. Co. v. Campbell Decorating Co.*, 102 Ga. App. 694 (117 SE2d 556) (1960) (clause permitting general contractor uncontrolled discretion to assess penalty on a subcontractor would be void). As discussed above, the option agreement provides McPhail with the power to veto Tyson's sale of the property to a third party during the course of the option. This provision also states that if McPhail approves such a sale, it and Tyson "shall equally divide the net proceeds therefrom," and the option agreement sets forth a complicated formula for calculating those "net proceeds."

This situation is similar to that discussed in *Newport Timber Corp. v. Floyd*, 247 Ga. 535 (277 SE2d 646) (1981), which concerned a two-year timber cutting contract. Pursuant to that contract, extensions to the contract were permitted in the event weather conditions prevented timber from being cut. Under that contract, the timber harvester had the *"uncontrolled and absolute right"* to determine when, as and if weather conditions are such as to prevent practical timber harvesting operations." (Punctuation omitted; emphasis supplied.) Id. at 536. The lessor contended that the discretion provided the harvester regarding extensions was unfettered, thus rendering the contract unenforceable. On appeal, the Georgia Supreme Court held that it may be "fairly implied from [the provision] as a whole that the discretion given [the timber harvester] was to be exercised in a sound and honest manner and in good faith, as otherwise the references to weather conditions and practical timber harvesting would be rendered meaningless." Id. at 541. Similarly, in the present case, a review of the entire provision reflects that McPhail would not exercise its discretion in an arbitrary manner as it stood to share in the profits from a sale to a third party. Otherwise, as in *Newport*, the complicated profit-sharing formula outlined in the option agreement would be rendered meaningless.

Second, Tyson argues that, when read together, paragraphs 9 and 10 of the option agreement create obligations so uncertain as to be unenforceable. The property under option formerly served as a gas station and still contained underground storage tanks. Paragraphs 9

and 10 allot the risks and costs of inspecting and/or removing the storage tanks as well as any hazardous materials from the property. Under paragraph 9 titled "Substances," McPhail may deduct a maximum amount of $25,000 from the purchase price for the costs it might incur in removing from the property "any *hazardous or toxic material or substance* . . . which may be prohibited, limited or regulated by any Federal, State, County, regional or local authority." (Emphasis supplied.) Paragraph 10, titled "Storage Tanks," provides that upon McPhail's request, Tyson, acting at his own expense, will "remove . . . the underground storage tanks on the property, including any *contaminated soils or materials*." (Emphasis supplied.) The term "contaminated soils and materials" used in paragraph 10 is undefined. Tyson asserts that his liability under these two provisions is ambiguous as it is unclear whether the cost of removing the tanks may be included in the $25,000 cap.

In interpreting a contract, an ambiguity will bar summary judgment only if the rules of contract construction fail to resolve it. One such rule provides that "[w]ords generally bear their usual and common signification." OCGA § 13-2-2 (2). Implicit in Tyson's argument is the conclusion that the term "hazardous or toxic material or substance" used in paragraph 9 and the term "contaminated soils or materials" used in paragraph 10 refer to the same thing. However, using the word's common meaning, a material that is "contaminated" is not necessarily hazardous or toxic as those two terms are defined within the option agreement. Another rule of construction requires contracts to be construed in a way that "gives meaning and effect to all the terms of the contract over that which nullifies and renders meaningless a part of the document." *Schafer Properties v. Tara State Bank*, 220 Ga. App. 378, 381 (469 SE2d 743) (1996); see also *Olympic Constr. v. Drywall Interiors*, 180 Ga. App. 142, 143-144 (348 SE2d 688) (1986) ("all terms of a contract are to be given full effect insofar as is practicable"). Employing this rule, any ambiguity created by paragraphs 9 and 10 is resolved. The option agreement would not have used two different terms in two sequential paragraphs to describe the same thing. Further, to interpret the two terms to mean the same thing would render the financial terms of paragraph 10 meaningless. In performing the cleanup obligation addressed in paragraph 9, Tyson's liability is limited to a $25,000 setoff in the purchase price. However, Tyson is to perform the removal required in paragraph 10 at his "sole expense." The financial responsibility for performing the obligations of each paragraph would not have been differentiated in this manner if the two paragraphs addressed the same thing.

As his final argument, Tyson contends that paragraph 13 of the option agreement is too vague to be enforced. It provides "Tyson

shall, prior to closing, remove without any damages or injuries to the Property or disturbing the Property all improvements, including all tires, automobiles, automobile parts [and] trailers from the property. All such items shall become the property of McPhail after closing." Tyson argues that a strict reading of this paragraph would require him to remove everything from the lot including all buildings and fixtures and to then deliver them to McPhail after closing.

In explaining this provision, Ray McPhail offered undisputed testimony that it was put in the option agreement at Tyson's request. "Mr. Tyson had wanted the things that were on the property, and I had no objection to his having them, but I wanted him to either take them, or if he did not take them, then they . . . would be mine and I would get rid of them. . . . [T]he intent was to give him whatever he wanted in the way of improvements, provided he took them."

When one party is aware of what the other party intended by a certain provision, he is estopped from later arguing a contrary interpretation. "[T]he meaning placed on the contract by one party and known to be thus understood by the other party at the time shall be held as the true meaning. OCGA § 13-2-4." (Punctuation omitted.) *Campos v. Williams*, 217 Ga. App. 296, 299 (457 SE2d 243) (1995). Consequently, Tyson is estopped from complaining that this provision, which was included at his request, is ambiguous.

*Judgment affirmed. Beasley, C. J., and Birdsong, P. J., concur.*

DECIDED NOVEMBER 25, 1996.

*Donald J. Snell*, for appellant.
*Bray & Johnson, H. Michael Bray*, for appellee.