**SECOND DIVISION**
**BARNES, P. J.,**
**MCFADDEN and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

March 8, 2013

# In the Court of Appeals of Georgia

A12A2253. GARRETT et al. v. SOUTHERN HEALTH CORPORATION OF ELLIJAY, INC.

Barnes, Presiding Judge.

Southern Health Corporation of Ellijay, Inc. entered into an option agreement to purchase land for the development of a new hospital facility. Under the remedies provision of the option agreement, Southern Health could recover damages from the sellers for breach of contract only if their breach was "willful and intentional." After Southern Health exercised its option to purchase the land but the sellers failed to close on the sale, Southern Health commenced this action against the sellers seeking, among other things, damages for breach of contract, and the sellers counterclaimed for fraudulent inducement. The trial court subsequently entered partial summary judgment in favor of Southern Health on its breach-of-contract claim, concluding that

the uncontroverted evidence showed that the sellers had willfully and intentionally breached the option agreement, entitling Southern Health to damages under the remedies provision as a matter of law. The trial court also granted partial summary judgment in favor of Southern Health on the sellers' counterclaim and denied the sellers' two separate motions for summary judgment.

For the reasons discussed below, we affirm the trial court's grant of summary judgment to Southern Health on the sellers' counterclaim for fraudulent inducement and its denial of the sellers' motions for summary judgment. However, we reverse the trial court's grant of Southern Health's motion for partial summary judgment on its damages claim for breach of the option agreement because there are genuine issues of material fact as to whether the sellers' breach was "willful."

> Summary judgment is appropriate if the pleadings and the undisputed evidence show that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). On appeal from the grant or denial of summary judgment, the appellate courts conduct a de novo review, construing all reasonable inferences in the light most favorable to the nonmoving party.

(Citation and punctuation omitted.) *Bank of North Ga. v. Windermere Dev., Inc.*, 316 Ga. App. 33, 34 (728 SE2d 714) (2012). Guided by these principles, we turn to the record in the present case.

*The Parties and the Property.* Southern Health operates North Georgia Medical Center and Gilmer Nursing Home in Gilmer County, Georgia. In 2007, Southern Health became interested in purchasing approximately 25 acres of unimproved property located on Highway 515 in Gilmer County (the "Property"). Southern Health wanted to build a new hospital on the Property.

The Property was comprised of six tracts. Mr. James P. Garrett, individually, owned one of the tracts. Ms. Roberta Mundy, personally, together with Mr. Garrett, owned another one of the tracts. The remaining four tracts were owned jointly by Mr. Garrett and Mr. William "Randy" Mundy, Jr., until the latter's death in 2006, whereupon Mr. Mundy's interest in the land passed to his estate. Following Mr. Mundy's death, a North Carolina court appointed his wife, Ms. Mundy, to serve as administratrix of his estate.

*Execution of the Option Agreement.* Southern Health entered into negotiations to purchase the Property from Mr. Garrett and Ms. Mundy (collectively, the

"Sellers"). On April 17, 2007, Mr. Garrett and Ms. Mundy, individually and as administratrix of her late husband's estate, executed an agreement with Southern Health under which they granted it an irrevocable option to purchase the Property in return for the payment of certain "option money" (the "Option Agreement"). The Sellers represented in the Option Agreement that they were the owners of good and marketable fee simple title to the Property, and they agreed to convey the Property at closing by limited warranty deed if the option was exercised.

Southern Health agreed to purchase the Property for $3,300,000 if it exercised the option. In Paragraphs 4 (d) and 22 (a) of the Option Agreement, the parties acknowledged that the purchase price included not only the Property, but also the installation of utility lines and facilities on the Property by Mr. Garrett and Ms. Mundy (the "Utility Work").

Mr. Garrett chose not to consult with an attorney before signing the Option Agreement. All of the communications and information that Ms. Mundy received about the Property and the Option Agreement came through Mr. Garrett. Ms. Mundy also declined to consult with an attorney.

*The Inspection Period.* The Option Agreement included an initial "Inspection Period" during which any of the parties could terminate the contract. The deadline for

the Inspection Period was July 23, 2007. Under Paragraph 4 (a) of the Option Agreement, Southern Health had the right to inspect and evaluate the Property and, if it was unsatisfied with the Property for any reason, terminate the Option Agreement before the end of the Inspection Period. After inspecting the Property, Southern Health elected not to terminate the Option Agreement during the Inspection Period.

Also during the Inspection Period, the Sellers had the right to determine whether they wanted to be responsible for the Utility Work. Under Paragraph 4 (d) of the Option Agreement, if the Sellers determined that they did not want to perform the Utility Work, they had the right to terminate the Option Agreement at any time before the end of the Inspection Period. Both Sellers testified that they did not exercise their right to terminate the Option Agreement during that time period.

*The Commitment Letter.* Because the Sellers did not terminate the contract within the Inspection Period, they were obligated under Paragraph 4 (e) of the Option Agreement to provide Southern Health with a "commitment letter" from a surety committing to issue a payment and performance bond that would cover the Sellers' performance of the Utility Work (the "Commitment Letter"). The Sellers never provided the Commitment Letter, despite several correspondence from Southern Health demanding that they fulfill their contractual obligation.

5

*The Utility Work.* Because the Sellers did not terminate the contract within the Inspection Period, they also were obligated under Paragraphs 4 (d) and 22 (a) of the Option Agreement to perform the Utility Work within 16 months of the closing of the sale if Southern Health exercised the option. During the summer of 2007, Mr. Garrett met with a government engineer from the water and sewer authority, along with Southern Health's representatives, to discuss the Utility Work. At that meeting, Mr. Garrett stated that he did not intend to pay for the water and sewer Utility Work, despite the fact that the Sellers were contractually obligated to perform the Utility Work at no additional expense to Southern Health if it exercised the option. Separately, Mr. Garrett told Ms. Mundy several times that he intended for others to bear at least some of the financial responsibility for performing the Utility Work, and Ms. Mundy agreed with him.

That same summer, representatives of Southern Health met with Mr. Garrett on another occasion to discuss the Utility Work, and he expressly refused to perform the Utility Work unless funds from other sources were found to pay it. In response, counsel for Southern Health explained that if the company exercised the option, it might have no alternative but to sue to enforce the Sellers' obligation to perform the

Utility Work. Mr. Garrett "basically" responded that Southern Health should "go ahead" and sue the Sellers.

*The Exercise of the Option.* On October 9, 2007, Southern Health exercised the option to purchase the Property. The parties agreed that the closing date for the sale would be December 7, 2007.

In a letter dated October 15, 2007, Southern Health addressed the upcoming closing and the failure of the Sellers to fulfill all of their contractual obligations up to that point. In the letter, Southern Health formally notified the Sellers that they had defaulted on their obligation to provide the Commitment Letter under the Option Agreement. Southern Health demanded prompt cure and further advised the Sellers that, regardless of whether they procured the Commitment Letter, Southern Health expected them to provide a payment and performance bond at closing (as required by Paragraph 22 (b) of the Option Agreement) and to perform the Utility Work within 16 months of the closing (as required by Paragraph 22 (a)).

*The Failure to Close.* In preparation for the scheduled closing, counsel for Southern Health sent a letter dated November 30, 2007 to the Sellers and their recently retained counsel that included a closing agenda and drafts of the closing documents, requested a form of the performance bond, and solicited the Sellers'

comments. In a letter dated December 3, 2007, Sellers' counsel responded to Southern Health's letter by pointing out a problem that he alleged had arisen with the upcoming closing. Counsel stated in the letter that, based on advice from North Carolina counsel, he believed that all of Mr. Mundy's heirs (including his two children and their spouses) would need to sign the limited warranty deed to convey the Property to Southern Health at closing. As a "simple solution" to this problem, counsel proposed that Southern Health accept a quitclaim deed from the Sellers rather than the limited warranty deed required by Paragraph 8 of the Option Agreement.

In a letter from its counsel dated that same day, Southern Health rejected the Sellers' proposal to close on a quitclaim deed rather than a limited warranty deed. Counsel stated that the title insurance company for the transaction had been informed of the circumstances of the estate in North Carolina, and the insurer had advised that it would be sufficient for only the Sellers to sign all of the closing documents. As such, counsel for Southern Health asserted that there were no "genuine impediments" that would prevent the Sellers from closing on the scheduled date.

Counsel for the Sellers responded to Southern Health in a letter dated December 5, 2007, stating that the Sellers would not provide a limited warranty deed and noting that they "were not close to being ready to close." Counsel further asserted

that because the Sellers had not been represented by counsel when they initially signed the Option Agreement, they had been unaware of the need for the heirs to sign the warranty deed until he had been hired to represent them and had taken steps to obtain legal advice from North Carolina counsel.

The day before the scheduled closing, Southern Health wired to the escrow agent sufficient funds that, when combined with amounts it had previously paid, represented the full purchase price for the Property. On December 7, 2007, Southern Health's representatives were present in the escrow agent's offices at the appointed hour for closing and were prepared to consummate the transaction on its behalf. However, the Sellers did not appear at the closing, and counsel for the Sellers confirmed by email that they were "not ready to close." It is undisputed that the Sellers did not provide the Commitment Letter and performance bond to Southern Health, did not execute any closing documents, did not convey title of the Property to Southern Health by limited warranty deed, and did not perform the Utility Work on the Property.

*The Lawsuit.* Paragraph 12 of the Option Agreement set forth certain remedies if the failure to consummate the sale of the Property was the result of the uncured default of the Sellers:

If, after Purchaser exercises the Option, said sale is not consummated by reason of the uncured default of Seller, then the Option Money shall be refunded to Purchaser, and Purchaser may exercise any and all remedies available to Purchaser at law or in equity, including an action for specific performance (in which event, the Option Money shall not be refunded to Purchaser); provided, however, Purchaser shall not be entitled to damages unless the default by Seller hereunder was willful and intentional. Pursuant to Paragraph 12, Southern Health filed the instant action for specific performance, breach of contract, fraud, attorney fees, and punitive damages after the Sellers failed to appear at the closing or otherwise consummate the sale of the Property. Southern Health later amended the complaint to withdraw its claim for specific performance and instead seek only monetary damages for the breach.

The Sellers answered and filed a counterclaim for fraudulent inducement. The Sellers alleged in their counterclaim that language contained in Paragraph 4 (d) of the Option Agreement regarding the Inspection Period was deceptive and had misled them.

*The Three Motions for Summary Judgment.* Following discovery, the Sellers moved for summary judgment. They asserted that the uncontroverted evidence showed that their default on the Option Agreement was not "willful and intentional," and that, as a result, Southern Health was not entitled to recover damages under Paragraph 12 of the Option Agreement. In this regard, the Sellers argued that an act

10

was not "willful" if it was "due to reasonable cause, and lacked evil intent or bad motive," and they contended that their default was merely the result of their failure to sign the warranty deed after learning that Mr. Mundy's children and their spouses had an interest in the Property under North Carolina law.

Southern Health then filed its own motion for partial summary judgment on its claim for breach of contract and on the Sellers' counterclaim for fraudulent inducement. According to Southern Health, the uncontroverted evidence showed that the Sellers' default on the Option Agreement was in fact "willful and intentional." In this respect, Southern Health argued that "willful" meant "voluntary and intentional, not necessarily malicious," and that the Sellers' decision not to fulfill its obligations under the Option Agreement had been a matter of deliberate choice rather than an accident or happenstance. Additionally, Southern Health argued that the Sellers' fraudulent inducement counterclaim could not be predicated simply on their failure to properly read and understand the language in the Option Agreement.

The Sellers subsequently filed a second motion for summary judgment. They asserted that Southern Health was not entitled to seek damages for breach because Paragraph 20 (a) of the Option Agreement restricted the remedies available to Southern Health, when certain contractual contingencies were not satisfied, to either

11

waiving those contingencies or terminating the contract without further recourse; that the uncontroverted evidence showed that the Sellers had terminated the Option Agreement during the Inspection Period in an email from their real estate broker to Southern Health's real estate broker; and that the Option Agreement had not been signed by an authorized representative of Southern Health and was unenforceable under the "equal dignity rule."

*The Summary Judgment Order.* Following a hearing, the trial court granted partial summary judgment in favor of Southern Health on its breach-of-contract claim and on the Sellers' counterclaim for fraudulent inducement, and the court denied the Sellers' two motions for summary judgment. The trial court ruled that "the only remaining issue for determination by a jury is the amount of damages that Sellers owe and are required to pay [Southern Health] for their willful and intentional breaches of contract."

1. The Sellers contend that the trial court erred in granting partial summary judgment in favor of Southern Health on its breach-of-contract claim. In granting partial summary judgment to Southern Health, the trial court concluded that the uncontroverted evidence showed that the Sellers' default on the Option Agreement was "willful and intentional," thereby entitling Southern Health to damages for

12

breach of contract under Paragraph 12 of the Option Agreement as a matter of law. We conclude, however, that the phrase "willful and intentional" as used in Paragraph 12 required evidence that the Sellers' default was done intentionally and in bad faith. Because there was conflicting evidence regarding whether the Sellers acted in bad faith, the trial court's grant of partial summary judgment to Southern Health on this issue was erroneous.

An option agreement, such as the one at issue here, "is simply a contract by which the owner of property agrees with another person that he shall have the right to buy the described property at a fixed price within a certain time specified." (Citation and punctuation omitted.) *Kent v. Graham Commercial Realty*, 279 Ga. App. 537, 542-543 (2) (631 SE2d 753) (2006). An option agreement is subject to the same rules governing the construction of other contracts. *Jakel v. Fountainhead Dev. Corp.*, 243 Ga. App. 844, 846 (534 SE2d 199) (2000).

"[T]he cardinal rule of contract construction is to ascertain the intention of the parties." (Punctuation and footnote omitted.) *Board of Commrs. of Crisp County v. City Commrs. of City of Cordele*, 315 Ga. App. 696, 699 (727 SE2d 524) (2012). If the terms of a contract are plain and unambiguous, the contractual terms alone determine the parties' intent. Id. A dictionary can supply the plain and ordinary

13

meaning of a term, see *Akron Pest Control v. Radar Exterminating Co.*, 216 Ga. App. 495, 497 (1) (455 SE2d 601) (1995), "[b]ut a dictionary does not always provide a complete answer." *Archer Western Contractors, Ltd. v. Estate of Pitts*, __ Ga. __ (2) (Case Nos. S12G0517, S12G0526, and S12G0527, decided Nov. 27, 2012). If a term used in a contract "is of uncertain meaning and may be fairly understood in more ways than one," it is ambiguous, *Akron Pest Control*, 216 Ga. App. at 497 (1), and we apply the rules of contract construction in an effort to resolve the ambiguity. *Board of Commrs. of Crisp County*, 315 Ga. App. at 699. The proper construction of a contract is a question of law for a court to determine. OCGA § 13-2-1.

Mindful of these principles, we must first determine whether the words "willful and intentional" as used in Paragraph 12 of the Option Agreement are clear and unambiguous. We turn first to the word "intentional," which we conclude is unambiguous. "Intentional" is commonly understood to mean "[d]one with the aim of carrying out the act." Black's Law Dictionary (9th ed. 2009). See also Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/intentional (defining "intentional" as "done by intention or design").

We reach a different conclusion with regard to the word "willful." On the one hand, "willful" can be defined simply as voluntary and deliberate. See Black's Law

14

Dictionary (9th ed. 2009) (defining "willful" as "[v]oluntary and intentional, but not necessarily malicious"). See also *Gibson v. State*, 265 Ga. App. 325, 328 (593 SE2d 861) (2004) (quoting American Heritage Dictionary definition of "willful" as "being in accordance with one's will; deliberate") (punctuation and emphasis omitted). On the other hand, "willful" can be defined as going beyond mere intentionality or deliberateness to also require an element of bad faith. See *In the Matter of Inquiry Concerning Judge No. 94-70*, 265 Ga. 326, 327-328 (1) (454 SE2d 780) (1995) ("willful misconduct" refers to "actions taken in bad faith"); *Weston v. Dun Transp. & Stringer, Inc.*, 304 Ga. App. 84, 89 (1) (695 SE2d 279) (2010) ("Wil[l]ful conduct is based on an actual intention to do harm or inflict injury.") (citation and punctuation omitted); *Telecash Investments, Inc. v. Lagrone*, 241 Ga. App. 66, 68 (1) (525 SE2d 112) (1999) ("willful" refers to "conduct of a criminal or quasi-criminal nature") (punctuation and footnote omitted).

Because "willful" has an "uncertain meaning and may be fairly understood in more ways than one," use of that word in Paragraph 12 of the Option Agreement is ambiguous. *Akron Pest Control*, 216 Ga. App. at 497 (1). See also *Johnson & Johnson v. Guidant Corp.*, 525 F. Supp.2d 336, 349 (II) (B) (S.D. N.Y. 2007) ("'Willful' is a notoriously ambiguous word, which can indicate any number of

15

mental states."); 57A Am. Jur. 2d Negligence § 260 (updated Nov. 2012) (noting that "[g]enerally, no spirit of ill will or intentional misconduct is essential to prove willfulness," but nevertheless noting that in some jurisdictions "willful misconduct does involve the element of malice or ill will"). Accordingly, we must apply the rules of contract construction in an effort to resolve the ambiguity. See *Board of Commrs. of Crisp County*, 315 Ga. App. at 699.

If "willful" is defined as voluntary and deliberate, its meaning would be interchangeable with the meaning of "intentional" used in the same paragraph of the Option Agreement. But it is a well-established rule of contract construction that a court should avoid an interpretation of a contract which renders any of its terms meaningless or mere surplusage. See *Flynt v. Life of South Ins. Co.*, 312 Ga. App. 430, 435 (1) (718 SE2d 343) (2011). See also *Woodbery v. Atlas Realty Co.*, 148 Ga. 712, 715 (1) (98 SE2d 472) (1919) (noting that "none of the words [in a contract] are to be considered as redundant, if a reasonable intendment can be given them"). Thus, to avoid rendering the word "intentional" in Paragraph 12 as mere surplusage, we must construe the word "willful" to include an element of bad faith. See *Pomerance v. Berkshire Life Ins. Co. of America*, 288 Ga. App. 491, 494-495 (1) (654 SE2d 638) (2007) (avoiding construction of the term "substantial" in an insurance contract that

16

would render it interchangeable with the term "material" used in the same contract) (physical precedent only); *Tyson v. McPhail Properties*, 223 Ga. App. 683, 689 (6) (478 SE2d 467) (1996) (concluding that contract "would not have used two different terms in two sequential paragraphs to describe the same thing"). See also *Metropolitan Life Ins. Co. v. Noble Lowndes Intl., Inc.*, 643 NE2d 504, 508 (N.Y. Ct. App. 1994) (concluding that in light of the language of the contract, the term "willful" "was intended by the parties to subsume conduct which is tortious in nature, i.e., wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties").

It follows that to recover damages under Paragraph 12 of the Option Agreement, Southern Health must show that the Sellers' default, which resulted in the failure to consummate the sale of the Property, was done intentionally and in bad faith. And while the uncontroverted evidence shows that the Sellers' decision not to appear at or otherwise carry through with the closing of the sale of the Property was intentional, there is conflicting evidence on the issue of bad faith.

The Sellers argued to the trial court that their failure to close "was due to reasonable cause, and lacked evil intent or bad motive." In this respect, they contended that their failure to close was caused by their need to have Mr. Mundy's

17

heirs consent to and sign the closing documents, a problem of which they were unaware until they retained counsel during the course of the transaction. According to the Sellers, they refused to close because they did not want to sign a limited warranty deed representing that they had full and complete title to the Property when the heirs also had an interest in the Property. To support their argument, the Sellers could point to the letters from their counsel to Southern Health explaining the problem involving the heirs, and Mr. Garrett's deposition testimony that he was unable to convince Brian Mundy, who was one of the heirs, to consent to the sale of the Property by the time of the scheduled closing. Additionally, Brian Mundy testified in his deposition that initially he had not wanted the sale of the Property to occur and was hesitant about the transaction when he first met with Mr. Garrett about it.

In contrast, Southern Health maintained in the trial court that the alleged issue over Mr. Mundy's heirs was manufactured by the Sellers, and that "the real reason" the Sellers would not close was that they had made the decision not to perform the Utility Work or their other obligations under the Option Agreement. Southern Health pointed to evidence that before the issue of the heirs arose as a point of contention between the parties, the Sellers failed to obtain a Commitment Letter, and Mr. Garrett repeatedly stated that he was unwilling to pay for the Utility Work as required in the

18

Option Agreement. Furthermore, to support its position that the issue of the heirs was a mere pretext, Southern Health pointed to deposition testimony from Ms. Mundy that she believed the dispute between the parties was over the Utility Work, that she was unaware of any communication between Mr. Garrett and her children (i.e., Mr. Mundy's heirs) about the sale of the Property, that her children never objected to the sale of the Property, and that her children never claimed to have any interest in the Property. Southern Health also pointed to other portions of Brian Mundy's deposition testimony where he appeared to contradict himself by stating that he had never been asked by anyone to attend the closing or to sign a warranty deed, and could not recall having ever refused to sign a warranty deed for the Property.

In light of the conflicting evidence, a genuine issue of material fact exists as to whether the Sellers defaulted on the Option Agreement in bad faith, and thus as to whether their default was "willful" as that word must be construed in this case. Accordingly, a jury must resolve whether the Defendant's default was "willful," which will determine whether Southern Health can recover damages for breach of contract under Paragraph 12 of the Option Agreement. See generally *Columbus Clinic, P.C. v. Liss*, 252 Ga. App. 559, 562 (556 SE2d 215) (2001) ("The intention with which an act itself is done is peculiarly a question for the jury."); *Coleman v.*

*Garrison*, 80 Ga. App. 328, 334 (5) (56 SE2d 144) (1949) (question of whether defendant's act is "wil[l]fully or innocently done is generally for the jury") (citation and punctuation omitted). We thus reverse the trial court's grant of partial summary judgment to Southern Health on its claim for breach of contract.[1]

2. The Sellers also contend that the trial court erred in granting partial summary judgment to Southern Health on their counterclaim for fraudulent inducement. Their counterclaim was predicated on Paragraph 4 (d) of the Option Agreement, which provided in relevant part:

> Seller and Purchaser acknowledge and agree that it is Purchaser's intention that the Purchase Price includes not only the Property, but also the Utility . . . Work, all as more particularly described in Section 22 below. During the Inspection Period, Seller shall determine whether or not it desires to be responsible for the performance of such construction work, at no cost or expense to Purchaser. Purchaser agrees to provide Seller with such documentation *as shall reasonably be required by the applicable governmental jurisdiction* to assist Seller in making its determination hereunder, including, but not limited to, providing Seller with such engineering studies *as may reasonable be required by such applicable governmental jurisdiction* . . . .

---

[1] Because genuine issues of material fact exist, we affirm the trial court's denial of the Sellers' first motion for summary judgment on Southern Health's breach-of-contract claim.

(Emphasis supplied.) According to the Sellers, the highlighted contractual language was deceitful and inconsistent with what the Sellers had understood would be provided to them by Southern Health during the Inspection Period to assist them in determining whether they wished to perform the Utility Work.

The Sellers' counterclaim for fraudulent inducement was without merit, as the trial court properly concluded.

> Although [the Sellers] asserted that the written terms of the [Option Agreement] deviated from what [they] understood the terms would be, one cannot claim to be defrauded about a matter equally open to the observation of all parties, absent the existence of a special relationship of trust or confidence. It was incumbent upon [the Sellers] to exercise ordinary diligence to make [their] own independent verification of the contractual terms[,] and [their] failure to do so bars an action based on fraud.

(Citations omitted.) *Fuller v. Greenville Banking Co.*, 230 Ga. App. 63, 64-65 (1) (495 SE2d 320) (1997). See also *Campbell v. Citizens & Southern Nat. Bank*, 202 Ga. App. 639, 640 (1) (415 SE2d 193) (1992) ("One not prevented from reading the contract, and having the capacity and opportunity to do so, cannot after signing it claim he was fraudulently induced to sign by promises which contradict the express

21

terms of the contract."). Hence, we affirm the trial court's grant of Southern Health's motion for partial summary judgment on the fraudulent-inducement counterclaim.

3. The Sellers also contend that the trial court erred in denying their second motion for summary judgment in which they raised several arguments for why Southern Health's claims should be dismissed. We will discuss each of their arguments in turn.

(a) In seeking summary judgment, the Sellers argued that under Paragraph 20 (a) of the Option Agreement, Southern Health's only two options upon the Sellers's failure to perform certain "closing contingencies" before the closing date (such as providing the Commitment Letter and the performance bond) was to waive those contingencies or terminate the contract. Because Southern Health never terminated the Option Agreement, the Sellers argued that Southern Health necessarily waived all of the "closing contingencies" by expressing its intent to proceed with the closing on December 7, 2007 and thus could not predicate its damages claim on the Sellers' failure to perform any of those contingencies. We are unpersuaded.

Paragraph 20 of the Option Agreement provided in relevant part:

> *CLOSING CONTINGENCIES.* Notwithstanding anything to the contrary contained in this Agreement, the obligations of Purchaser under

this Agreement shall be and are hereby made subject to and contingent upon the satisfaction of certain contingencies (hereinafter referred to as the "Closing Contingencies"), which are more particularly described below. *The Closing Contingencies are for the benefit of Purchaser*, and Purchaser may at any time waive all or any thereof without affecting any of other terms and conditions of this Agreement. Each party hereto shall exercise reasonable, good faith efforts to satisfy those of the Closing Contingencies for which it is responsible (as indicated below).

A. Should any of the Closing Contingencies set forth in this Section 20 (A) ... fail to be satisfied on or before the Closing Date, then Purchaser may elect either to (a) waive such contingency by written notice to Seller, or (b) terminate this Agreement by written notice to Seller, in which event the sum of $100.00 shall be disbursed to Seller out of the Option Money, and the entire balance of the Option Money shall be refunded to Purchaser and *(except as otherwise herein expressly provided)* no party hereto shall have any further rights or obligations hereunder.

(Emphasis supplied.) Paragraph 20 (a) then provided a list of "Closing Contingencies" that had to be performed by the Sellers on or before the closing date, which encompassed providing the Commitment Letter and the performance bond.

As an initial matter, the unambiguous language of Paragraph 20 (a) makes clear that the provision was intended to be "for the benefit of Purchaser," Southern Health.

23

To read the provision as Sellers do to restrict, rather than expand, Southern Health's remedies under the Option Agreement would be inconsistent with this clearly expressed intent. See generally *Board of Commrs. of Crisp County*, 315 Ga. App. at 699 (ascertaining the intent of the parties is the "cardinal rule" of contract construction); *Ashkouti v. Widener*, 231 Ga. App. 539, 541 (3) (500 SE2d 337) (1998) (contractual provision intended for plaintiff's benefit could be waived by him and should not be used to preclude plaintiff's breach-of-contract claim).

Furthermore, Southern Health did not sue the Sellers merely for their failure to carry out one or more of the listed "Contract Contingencies" prior to the scheduled closing. Rather, Southern Health sued the Sellers for their total default on the Option Agreement resulting in the failure to consummate the sale of the Property, a lawsuit specifically authorized by Paragraph 12 of the Option Agreement. Under the applicable rules of statutory construction, "the whole contract should be looked to in arriving at the construction of any part." (Citation and punctuation omitted.) *Immel v. Immel*, 298 Ga. App. 424, 426 (680 SE2d 505) (2009). Courts are "to give effect to each provision[] and to interpret each provision to harmonize with [the] other[s]." (Punctuation and footnote omitted.) *Board of Commrs. of Crisp County*, 315 Ga. App. at 700. Thus, Paragraph 20 (a) must be read together with Paragraph 12, which

24

provided Southern Health the right to recover damages for a "willful and intentional" default by the Sellers, if the sale of the Property was "not consummated by reason of [the Sellers'] uncured default."

When read in conjunction with Paragraph 12, it is clear that Paragraph 20 (a) was not intended to curtail the right of Southern Health to sue for breach of contract if the sale of the Property failed to occur. More specifically, in the event that the Sellers failed to perform any one of the "Closing Contingencies," Paragraph 20 (a) gave Southern Health the option to terminate the contract or waive the contingency and insist on closing the sale. However, if the closing ultimately failed to occur due to the uncured default of the Sellers, then Paragraph 12 authorized Southern Health to sue for breach of contract. That is what occurred here. Consequently, Southern Health was authorized to bring the instant action for damages pursuant to Paragraph 12 of the Option Agreement, and the trial court did not err in denying summary judgment to the Sellers on the asserted ground.

(b) The Sellers further argued in their second motion for summary judgment that the uncontroverted evidence showed that they had terminated the Option Agreement during the Inspection Period through a July 9, 2007 email from their real estate broker to Southern Health's real estate broker. The Sellers maintained that the

25

Option Agreement was not longer binding on them from that point forward and could not be relied upon by Southern Health to support their breach-of-contract claim. Again, we are unpersuaded.

On its face, the July 9, 2007 email did not effect a termination of the Option Agreement. The email was from one real estate broker to another expressing the broker's belief that the sale would not close, and there is no evidence that the email was forwarded or copied to any of the contracting parties, even though the Option Agreement required all notices to be delivered "to the party being given such notice at the address of such party set forth" in the contract. Moreover, the email expressly acknowledged that the parties were "still under contract" and did not use the word "terminate" or any other words of similar import.

Additionally, three days after the email, the parties signed an amendment to the Option Agreement extending the Inspection Period, which would have been pointless if a termination had just occurred. And, on November 7, 2007, four months after the email, the parties signed an "Amendment to Option Agreement," expressly stating that the Option Agreement "shall remain in full force and effect as originally executed." Finally, both Sellers testified that they did not terminate the Option Agreement during the time frame of the Inspection Period.

26

Under these circumstances, the July 9, 2007 email from one broker to another cannot reasonably be construed as notice from the Sellers to Southern Health that they were terminating the Option Agreement. Rather than effecting a termination of a $3,300,000 deal, the email simply involved one broker expressing her belief to the other that the transaction ultimately would not close. The trial court therefore committed no error in rejecting the Sellers' argument that they were entitled to summary judgment because the Option Agreement had been terminated during the Inspection Period. See, e. g., *King Indus. Realty v. Rich*, 224 Ga. App. 629, 630 (2) (481 SE2d 861) (1997) (warnings or predictions of future termination did not themselves constitute notice of termination as required under contract); *Shiflett v. Anchor Rome Mills*, 78 Ga. App. 428, 433 (3) (50 SE2d 853) (1948) (landlord's letter could not be construed as notice of termination of lease contract, given that "nowhere in said purported notice did it state that the contract was cancelled or that the same was terminated").

(c) Lastly, the Sellers argued that they were entitled to summary judgment because the Option Agreement had not been executed by a representative of Southern

Health shown to have authority to act on its behalf, and because the contract was unenforceable under the "equal dignity rule." These arguments lack any merit.[2]

First, the uncontroverted evidence showed that the Option Agreement was executed by a representative of Southern Health authorized to act on its behalf. The first page of the Option Agreement identified Southern Health as the purchaser, and Paragraph 11 expressly provided that "[e]ach party hereto warrants to each other party hereto that the warranting party has full power and authority to enter into this Agreement and perform its obligations hereunder." The signature page of the Option Agreement reflects that it was signed by Sheila Brockman, in her capacity as the Assistant Secretary of Southern Health, and both Ms. Brockman and her direct supervisor testified in their respective depositions, without contradiction, that Ms. Brockman had authority to sign the contract on behalf of Southern Health. The Sellers have not pointed to any conflicting evidence which would suggest that Ms. Brockman lacked authority to act on behalf of Southern Health, and we have found none.

---

[2] On appeal, the Sellers also argue for the first time that the Option Agreement was unenforceable because there is no competent evidence of record that Southern Health's Board of Directors voted to approve the Option Agreement, as required by Paragraph 20 (b) of the contract, which listed certain "Closing Contingencies" that had to be satisfied by Southern Health. Because the Sellers failed to raise this argument in the trial court, we decline to consider it here. See *Wellons, Inc. v. Langboard, Inc.*, 315 Ga. App. 183, 186 (1) (726 SE2d 673) (2012).

28

Second, the Sellers' argument that the Option Agreement was unenforceable under the "equal dignity rule" as set forth in OCGA § 10-6-2 is misplaced. Pursuant to that rule, "the authority of an agent to execute an instrument required by the Statute of Frauds to be in writing must also be in writing." *Dunn v. Venture Building Group*, 283 Ga. App. 500, 502 (1) (642 SE2d 156) (2007). See OCGA § 10-6-2 ("Where the exercise or performance of an agency is by written instrument, the agency shall also be created by written instrument[.]"). Because the Statute of Frauds requires that an option contract for the purchase of land be in writing, see OCGA § 13-5-30 (4); *Estate of Ryan v. Shuman*, 288 Ga. App. 868, 871 (1) (655 SE2d 644) (2007), the authority of an agent to execute such a contract likewise must be in writing. See *Dunn*, 283 Ga. App. at 502 (1). Nevertheless, even if Ms. Brockman's authority to sign the Option Agreement on behalf of Southern Health was given to her verbally rather than in writing, the Sellers are not the correct parties to challenge her authority under the "equal dignity rule." See *Barron Reed Constr. v. 430, LLC*, 275 Ga. App. 884, 886 (1) (622 SE2d 83) (2005) (concluding that "in cases where the ['equal dignity rule'] is invoked, the invoking party is the principal who is challenging the authority of its own alleged representative") (citations and punctuation omitted).

Thus, the Sellers were not entitled to rely upon the "equal dignity rule" in support of their second summary judgment motion, which the trial court properly denied.

*Judgment affirmed in part and reversed in part. McFadden, J., concurs. McMillian, J., specially concurs.*

A12A2253. GARRETT et al. v. SOUTHERN HEALTH CORPORATION OF ELLIJAY, INC.

McMILLIAN, Judge, concurring specially.

Although I concur fully in Divisions 2 and 3, I cannot agree with all that is said in Division 1. I am particularly concerned that the majority has rewritten the parties' agreement to insert an additional term – "bad faith"--which is itself subject to varying interpretations and which the majority does not define.

I do believe, however, that under the terms of the Option Agreement, a genuine issue of material fact exists as to whether the Sellers' default was "willful and intentional." The parties did not and could not have intended for the Sellers to go forward with the closing if there was a true legal impediment to the Sellers' ability to close. And, clearly, the inability to give clear title to the property would constitute

such an impediment.[1] For this reason, and based on the facts as presently developed, I agree that the issue of whether the Sellers' default was "willful and intentional" for purposes of recovering damages under the Option Agreement must be submitted to a jury for resolution.

---

[1] In rejecting the Sellers' proposal to close on a quitclaim deed rather than a limited warranty deed, counsel for Southern Health relied on information from the title insurance company to assert that there were no "genuine impediments" to prevent the Sellers from closing. This suggests that even Southern Health expected that the parties not go forward with the closing if the Sellers truly had a legal impediment to conveying clear title.