**THIRD DIVISION**
**DOYLE, P. J.,**
**GOBEIL, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 15, 2023**

# In the Court of Appeals of Georgia

A23A0429. FREEMAN CAPITAL GROUP, LLC v. DRURY et al.

DOYLE, Presiding Judge.

Freeman Capital Group, LLC, ("the plaintiff") provided seed money to Carl M. Drury ("Chip"), Kathryn Drury, and their family entities, including Georgia Destination Holdings, LLC, ("GDH"), to recover a foreclosed commercial property ("the Property") in Atlanta. The parties' Operating Agreement, which contained certain member protections, granted the plaintiff a 20 percent stake in the holding company for the Property, MSD Expo, LLC ("MSD"). Chip — the manager of MSD — later sold the property to West Midtown Destinations, LLC ("WMD"), an affiliate of Chip and GDH, for $2.5 million; approximately three weeks later, the Property was resold to a third-party for $8 million. The plaintiff sued Chip, Kathryn, GDH, WMD, and other related entities alleging multiple claims. The plaintiff appeals the trial

court's grant of summary judgment to the defendants, and for the reasons that follow, we reverse.

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law."[1]

So viewed, the record shows that the plaintiff,[2] through its lending affiliate, Diversified Holdings, LLLP, loaned Chip, through his entity MSD Expo, $900,000 to buy back the foreclosed Property located in West Midtown in Atlanta.[3] The deal terms were heavily negotiated, including the terms of the August 16, 2013 MSD Expo Operating Agreement, which provided the plaintiff with a 20 percent equity interest in MSD Expo; the other 80 percent membership interest went to GDH, which is managed by Chip and owned by Kathy.

---

[1] *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991), citing OCGA § 9-11-56 (c).

[2] The plaintiff is a real estate development and investment company run by Paul Freeman (now deceased), Adam Freeman, and Brad Berman.

[3] Approximately $600,000 was used to buy the Property, $100,000 went towards expenses related to the Property, and the remaining approximately $200,000 was used to cover Chip and Kathy's family expenses.

The Operating Agreement defined "'Manager,' whether one or more, [as] the Person or Persons designated as such in Article V," which named Chip as the Manager in Section 5.1.1. The Operating Agreement defined "'Member'" as "each person signing this Agreement as a Member and any Person who subsequently [wa]s admitted as a member of the Company." Chip signed the Operating Agreement for MSD Expo, with the term "Manager" after his name; he and Paul Freeman, both designated as "Manager," signed as "MEMBERS."

Section 5.1.2 of the Operating Agreement (the "Management Powers Provision") granted Chip, as Manager,

> *full, exclusive, and complete discretion, power, and authority*, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, *to manage, control, administer, and operate the business and affairs of the Company* for the purposes herein stated, *and to make all decisions affecting such business and affairs, including*, without limitation, for Company purposes, *the power to*: . . . 5.1.2.3 *sell, dispose, trade, or exchange Company assets* as long as such is done without violating Section 5.7 hereof. . . .[4]

Section 5.7 provided:

---

[4] (Emphasis supplied.)

The Manager and the Company may sell the assets of the Company at anytime [sic] without consent of any Member prior to the expiration of the Lockout Period provided the [Diversified] Note is prepaid in full at that time. If the [Diversified] Note is not prepaid during the Lockout Period, thereafter *the Manager may sell the assets of the Company at anytime [sic] for a price equal to or in excess of $[2.5 million] without any consent, approval[,] or other action being necessary or required from any Member* or other party in connection therewith.[5]

Section 5.4.3 of the Operating Agreement (the "Self-dealing Provision") stated that "Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Manager, Member[,] and their Affiliates. In any of those cases, those *dealings and undertakings shall be at market rates and on commercially reasonable terms*."[6]

Section 5.4.4 ("the Harmful Conduct Provision") provides:

---

[5] (Emphasis supplied.)

[6] (Emphasis supplied.) The Operating Agreement defines "Affiliate" as: "with respect to Member, any person: (i) in the case of an individual, any relative of such Person; (ii) any officer, director, trustee, partner, manager, employee[,] or holder of ten percent . . . or more of any class of the voting securities of or equity interest in such Person; (iii) any . . . limited liability company . . . controlling, controlled by[,] or under common control with such Person; or (iv) any officer, director, trustee, partner, manager, employee[,] or holder of ten percent . . . or more of the outstanding voting securities of any . . . limited liability company . . . controlled by or under common control with such Person.

The activities of the Members permitted under this Agreement shall be limited in that *no Member or its Affiliates shall take any action*, directly or indirectly, or through one or more intermediaries, *which is harmful to the ability of the Company to develop, sell, finance, plan or negatively [a]ffects the Company['s] ability to deal with the [Property]*. . . .[7]

The Diversified Note was scheduled to mature on August 15, 2016, and on July 28, 2016, Berman, on behalf of Diversified and at Chip's request, agreed to extend the Note maturity date indefinitely to allow Chip to obtain refinancing. At no time did Diversified threaten to foreclose on the Property. Nevertheless, unbeknownst to the plaintiff, on May 17, 2016, Chip proposed a deal to his uncle, defendant Wiley Drury, in which Wiley would provide Chip and Kathy with financing assistance to conduct an initial $2.5 million sale of the Property, which would eliminate the plaintiff's interest in MSD Expo and "preserve . . . long term capital gains for [Chip and Kathy's company,] GDH[,] related to the sale of the Property. . . ."

On May 20, 2016, Chip represented to a bank that a verbal offer had been made for the Property for $14.2 million, and he valued the Property as "$14 million plus." On July 19, 2016, the Property was appraised to be worth $11.5 million.

---

[7] (Emphasis omitted.)

On August 11, 2016, Chip caused MSD Expo to sell the Property for $2.5 million to WMD.[8] There are two sets of notes purportedly financing the sale, one payable to Wiley and the other to MSD Expo. The notes contain no maturity date or penalty for non-payment, and Wiley later testified that he did not know which set of notes was operative or whether any amounts were ever paid on them. The plaintiff did not learn of the sale until the date of the closing. When asked if he had an interest in the entity buying the Property, Chip replied that he did not. Approximately three weeks later, on September 2, 2016, WMD sold the Property to a third-party for $8 million.

On January 27, 2017, the plaintiff sued the defendants in the Superior Court of Gwinnett County, alleging the following claims against GDH and Chip: breach of operating agreement; breach of implied covenant of good faith and fair dealing, or in the alternative, unjust enrichment; and breach of fiduciary duty. It alleged against Kathy Wiley, WMD, WLD Holdings, and Laurens Holdings claims for tortious interference with contract and aiding and abetting breach of fiduciary duty. And it alleged the following claims against all defendants: fraud, fraudulent transfer and

[8] Again, WMD's sole member is GDH, which is owned by Kathy and managed by Chip, and its manager is Chip.

equitable relief, conspiracy to defraud, engage in fraudulent transfers, and breach of fiduciary duties.

The case was later transferred to the Superior Court of Camden County, which denied the defendants' motion for summary judgment on August 5, 2019.[9] More than three years later, the case was scheduled for trial on August 29, 2022. At the August 24, 2022 pretrial hearing on all outstanding motions in limine, the trial court announced that it was rescinding the denial of summary judgment to the defendants.

Following additional oral argument on the motion, the trial court granted summary judgment to the defendants on September 2, 2022, dismissing the case with prejudice. In the order, the trial court found that pursuant to Section 5.7 of the Operating Agreement, Chip was permitted to sell the Property without the consent of the plaintiff for at least $2.5 million, and that to the extent Section 5.7 conflicted with the Harmful Conduct Provision and the Self-Dealing Provision, Section 5.7 prevailed. The order did not address whether GDH, the majority member of MSD Expo and whose actions are not governed by Section 5.7, could be liable under any breach of contract or tort theory nor did it address any of the other tort claims asserted against

---

[9] The trial court denied the defendants' request for a certificate of immediate review.

the other five parties to the case that do not depend on the Operating Agreement for their viability. This appeal followed.

1. The plaintiff alleges that the trial court erred by holding that Section 5.7 prevailed over other provisions in the Operating Agreement. We agree.

On appeal, we review the trial court's construction of a contract de novo.[10] "The cardinal rule of contract construction is to ascertain the intention of the parties."[11] Contract interpretation is guided by three steps:

> First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.[12]

---

[10] See *Borders v. City of Atlanta*, 298 Ga. 188, 197 (II) (779 SE2d 279) (2015).

[11] OCGA § 13-2-3.

[12] (Punctuation omitted.) *City of Baldwin v. Woodard & Curran, Inc.*, 293 Ga. 19, 30 (3) (743 SE2d 381) (2013). See also *Borders*, 298 at 196 (II).

8

"In the face of ambiguity, we must look to the entirety of the agreement to determine the intent of the parties. Indeed, it is axiomatic that contracts must be construed in their entirety and in a manner that permits all of the terms contained therein to be consistent with one another."[13] Pursuant to OCGA § 13-2-2 (4), "[t]he construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part."

Here, pursuant to Section 5.7 of the Operating Agreement, Chip was permitted to sell the Property for $2.5 million or more without any consent or action by any other party. Under the Self-dealing Provision, if such a sale involved an "affiliate," it had to have been made "at market rates and on commercially reasonable terms." These two provisions do not conflict; instead, read together, they simply require that any sale involving an affiliate be made at market rates and on commercially reasonable terms and that any sale under $2.5 million required the plaintiff's consent.

Similarly, Section 5.7 does not conflict with the Harmful Conduct Provision, which prohibits members from taking "any action, directly or indirectly, or through

_____

[13] (Punctuation omitted.) *Langley v. MP Spring Lake, LLC*, 307 Ga. 321, 324 (834 SE2d 800) (2019).

9

one or more intermediaries," which harms MSD Expo's ability to market or sell the Property. Regardless of whether a sale of the property triggered the consent requirement of Section 5.7, a member was prohibited from violating the Harmful Conduct Provision.

Reading the three provisions together to give each effect, as required by the rules of contract construction,[14] while Section 5.7 of the Operating Agreement did not require the plaintiff's consent for the $2.5 million sale of the Property to WMD, under the Self-dealing and Harmful Conduct Provisions, the sale had to have been "at market rates and on commercially reasonable terms," and Chip and GDH were prohibited from taking any action, through WMD or otherwise, which was harmful to MSD Expo's ability to market or sell the Property.

The trial court erred as a matter of law by finding that Section 5.7 conflicts with and prevails over the Self-dealing and Harmful Conduct Provisions. And because the evidence, viewed in favor of the plaintiff as the non-movant, created a jury question as to whether the sale of the property violated the Operating Agreement, the trial court erred by granting summary judgment to the defendants on those claims.

---

[14] See *Garrett v. S. Health Corp. of Ellijay, Inc.*, 320 Ga. App. 176, 188 (3) (a) (739 SE2d 661) (2013).

10

2. The plaintiff contends that the trial court's interpretation of the Operating Agreement violates OCGA § 14-11-305 (4) (A), which prohibits operating agreements from being drafted to avoid member or manager liability for intentional misconduct or violation of any provision thereof for personal benefit. In light of our holding in Division 1, we need not address this enumeration.

3. The plaintiff also argues that questions of fact preclude summary judgment on the claims that do not involve the trial court's finding that Section 5.7 of the Operating Agreement limits Chip's liability, which claims the trial court did not address in its order. We agree.

The evidence, viewed in favor of the plaintiff, reveals numerous disputed factual issues, including, but not limited to those related to claims regarding: GDH's liability under the Operating Agreement; Chip's and GDH's liability under OCGA § 14-11-305 (4) (A) and with regard to their fiduciary duties as majority member and manager of MSD Expo; and the non-parties' actions.

Accordingly, the trial court's order granting summary judgment to the defendants is reversed.

*Judgment reversed. Gobeil, J., and Senior Appellate Judge Herbert E. Phipps concur.*