**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 16, 2013**

# In the Court of Appeals of Georgia

A13A0349. WILLESEN d/b/a 2W COMMUNICATIONS. v. ERNEST COMMUNICATIONS, INC.

BRANCH, Judge.

Marvin G. Willesen, d/b/a 2W Communications ("2W") filed suit against Ernest Communications, Inc. ("ECI") for commissions allegedly due under a contract between the parties. 2W now appeals from orders granting ECI's motion for a directed verdict and denying 2W's motion for a new trial. Specifically, 2W contends that the trial court erred in finding (i) that the contract's exculpatory clause barred 2W's claim for payment of its earned commissions and (ii) that 2W had failed to prove its damages. We agree and therefore reverse the trial court's orders.

The record shows that ECI is a telecommunications carrier authorized by both the FCC and a number of state public utility commissions to provide and sell

telecommunication services to the public. On March 1, 2004, 2W and ECI entered into an "ECI Authorized Sales Agent Agreement." Under that agreement, 2W agreed to market and sell ECI's services to third parties (referred to by the parties as "end users"), and ECI agreed to pay 2W a commission on the services it sold.[1] Additionally, the agreement granted ECI the right to terminate the agreement "without cause at any time by providing [2W] at least one (1) month prior written notice." With respect to 2W's sales commissions, the agreement provides, in relevant part:

> ECI will send an invoice to each End User . . . each month detailing the End Users charges for the Service(s). . . . These invoices shall direct End Users to remit payments directly to ECI. An End User's payment shall be applied to the End User's oldest applicable outstanding invoice. . . . Within ten (10) business days after the End User invoices are distributed to End Users by ECI, ECI shall forward a monthly commission statement to Sales Agent [2W]. . . . Commission payments shall be paid by ECI to Sales Agent within thirty (30) days after the date of the corresponding monthly statement. ECI will hold all commission payments on any End User accounts that are more than 30 days past due. Once an End User's accounts [are] brought current, the supporting details and commission payments associated with that End User's account will be reflected on

---

[1] The formula for calculating the amount of commissions that 2W would be owed was set forth in a separate schedule attached to and made a part of the parties' agreement. Even after the termination of the contract, 2W is entitled to receive continued commissions on any account it brought to ECI during the term of the agreement.

the Sales Agent's next monthly commission statement. . . . ECI will continue to pay commissions to Sales Agent on any new or existing End User accounts attributable to Sales Agent provided the End User remains an ECI customer, including after termination or expiration of this Agreement.

The agreement also contains an exculpatory clause, captioned "Limitation of Liability," that provides:

Sales Agent acknowledges that service provisioning failures and service interruptions in the telecommunications industry frequently are due to circumstances beyond a carrier's normal control and are difficult to assess as to cause or resulting damages. Accordingly, Sales Agent's sole remedy for ECI's failure or inability to perform its obligations under this Agreement shall be to terminate this Agreement. ECI MAKES NO WARRANTY EITHER EXPRESSED OR IMPLIED, CONCERNING ITS TELECOMMUNICATIONS SERVICES, INCLUDING WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE. IN NO EVENT SHALL ECI BE LIABLE TO SALES AGENTS OR TO ANY END USERS FOR ANY AMOUNTS REPRESENTING LOSS OF PROFITS, LOSS OF BUSINESS, INDIRECT, SPECIAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES ARISING FROM THE PERFORMANCE OR NONPERFORMANCE OF THIS AGREEMENT OR ANY ACTS OR OMISSIONS ASSOCIATED THEREWITH OR RELATED TO THE USE OF ANY ITEMS OR SERVICES FURNISHED HEREUNDER, WHETHER THE BASIS OF

3

LIABILITY IS BREACH OF CONTRACT, TORT . . . , STATUTORY, OR ANY OTHER LEGAL THEORY. ECI'S OBLIGATIONS TO END USER ARE LIMITED BY ITS ORDER FORMS, AGREEMENTS, AND APPLICABLE STATE AND FEDERAL TARIFFS.

(Emphasis in original.)

Sometime in or around late 2007, a dispute arose between 2W and ECI regarding commissions owed 2W on the accounts of two corporate customers to whom 2W had sold ECI's services. As a result of this dispute, ECI terminated its agreement with 2W on February 26, 2008. After ECI refused to pay any further commissions on the disputed accounts, 2W filed this lawsuit, seeking to recover those commissions. The case proceeded to trial in March 2012. To prove the amount of commissions it was allegedly owed, 2W introduced evidence showing the amounts that had been billed to the two disputed clients between December 2007 and March 2012[2] and the commission that would be owed on those billed amounts under the terms of the parties' agreement.

At the close of 2W's case, ECI moved for a directed verdict on two grounds. First, ECI argued that 2W had failed to prove its damages because it had shown only

---

[2] As best we can tell from the record, no commissions were paid to 2W on the accounts at issue after November 2007.

4

the amounts billed to the disputed clients, but had failed to show that the clients had, in fact, paid those bills. And according to ECI, no commissions were earned under the contract unless and until the end user paid the bills; thus, because 2W had failed to show that the bills had been paid, it had failed to prove that it had earned a commission on the billed amounts. Additionally, ECI argued that the agreement's exculpatory clause barred 2W from suing to recover any unpaid commissions owed it under the contract. The trial court agreed with both of ECI's arguments, and granted a directed verdict in its favor.

Following the entry of the written order granting ECI a directed verdict, 2W filed a motion for a new trial, which was denied. This appeal followed.

1. The questions presented by this appeal require us to interpret the contract between the parties. The interpretation of a contract is normally a question of law to be resolved by the court, and the orders of the lower court in this case are therefore subject to de novo review. *Goody Products v. Dev. Auth. of City of Manchester*, 320 Ga. App. 530, 535 (2) (740 SE2d 261) (2013). This review requires us first to decide whether the contract provisions at issue are ambiguous. Id. If there is no ambiguity, then we simply enforce the contract according to its terms. *Holmes v. Clear Channel Outdoor*, 284 Ga. App. 474, 476 (2) (644 SE2d 311) (2007). Where an ambiguity

5

exists, however, we resolve that ambiguity by applying the statutory rules of construction to ascertain the intent of the parties. *Garrett v. Southern Health Corp. of Ellijay*, 320 Ga. App. 176, 182 (1) (739 SE2d 661) (2013); OCGA § 13-2-2. Those rules require us to interpret any isolated clauses and provisions of the contract in the context of the agreement as a whole, *Jones v. Destiny Indus.*, 226 Ga. App. 6, (2) (485 SE2d 225) (1997); to construe any ambiguities most strongly against the party who drafted the agreement, *Hertz Equip. Rental Corp. v. Evans*, 260 Ga. 532, (397 SE2d 692) (1990); and to give the contract a "reasonable construction that will uphold the agreement rather than a construction that will render the agreement meaningless and ineffective." (Citation omitted.) *McLendon v. Priest*, 259 Ga. 59, 60 (376 SE2d 679) (1989).

2. We first address whether the contract's exculpatory clause bars 2W from suing to recover any unpaid commissions owed it under the contract. We find that it does not.

In analyzing this issue, we note that "because exculpatory clauses may amount to an accord and satisfaction of future claims and waive substantial rights, they require a meeting of the minds on the subject matter and must be explicit, prominent, clear and unambiguous." (Citation and punctuation omitted.) *Holmes*, supra at 477 (2).

6

Moreover, because the contract at issue is a form agreement created by ECI, any ambiguity in the exculpatory clause must be construed against ECI. Id. Additionally, the clause must be read in the context of the contract as a whole, bearing in mind the essential purpose of that contract. *Garrett*, supra at 188 (3) (a). In this case, the essential purpose of the contract was to make 2W an authorized sales agent of ECI. Thus, 2W agreed to market and sell ECI's services and, in exchange, ECI agreed to compensate 2W for its successful efforts.

Bearing in mind the essential purpose of the contract, we now turn to the exculpatory clause. That clause contains five sentences; ECI, however, relies on only one sentence to support its argument that the clause prevents 2W from seeking to recover the unpaid commissions it is owed under the contract. And in making this argument, ECI takes the sentence out of context, i.e., it does not read that sentence in conjunction with the remainder of the exculpatory clause or in the context of the entire contract. When placed in context, however, it becomes clear that the exculpatory clause does not preclude the claims asserted by 2W in this case.

Notably, the exculpatory clause begins by stating:

Sales Agent acknowledges that *service provisioning failures and service interruptions in the telecommunications industry frequently are due to circumstances beyond a carrier's normal control and are difficult to*

7

*assess as to cause or resulting damages. Accordingly* [i.e., because of the facts acknowledged in the preceding sentence], Sales Agent's sole remedy for ECI's failure or inability to perform its obligations under this Agreement shall be to terminate this Agreement. ECI MAKES NO WARRANTY EITHER EXPRESSED OR IMPLIED, CONCERNING ITS TELECOMMUNICATIONS SERVICES, INCLUDING WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE.

(Emphasis supplied.) Additionally, the fifth and final sentence of the exculpatory clause provides: "ECI'S OBLIGATIONS TO END USER ARE LIMITED BY ITS ORDER FORMS, AGREEMENTS, AND APPLICABLE STATE AND FEDERAL TARIFFS."

When read together, it is clear that these four sentences of the exculpatory clause are intended to shield ECI from claims arising from service provisioning or equipment failures and service interruptions. Indeed, ECI's brief implicitly concedes this fact, as its analysis fails even to acknowledge these four sentences. Instead, ECI focuses solely on the language of the clause's fourth sentence, which provides:

IN NO EVENT SHALL ECI BE LIABLE TO SALES AGENT *OR TO ANY END USERS* FOR ANY AMOUNTS REPRESENTING LOSS OF PROFITS, LOSS OF BUSINESS, INDIRECT, SPECIAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES

8

ARISING FROM THE PERFORMANCE OR NONPERFORMANCE OF THIS AGREEMENT OR ANY ACTS OR OMISSIONS ASSOCIATED THEREWITH *OR RELATED TO THE USE OF ANY ITEMS OR SERVICES FURNISHED HEREUNDER*, WHETHER THE BASIS OF LIABILITY IS BREACH OF CONTRACT, TORT, . . . STATUTORY, OR ANY OTHER LEGAL THEORY.

(Emphasis supplied.)

Ignoring the remainder of the exculpatory clause, ECI argues that this one sentence, read in isolation, bars 2W's claim for unpaid commissions because such amounts represent either special damages or lost profits. When the entire clause is read together and considered as part of the contract as a whole, however, its purpose is clear: it is designed to limit ECI's liability to both its sales agent and any end users where the basis for that liability is ECI's failure and/or inability to provide the telecommunications services sold by the sales agent to end users, or from any deficiencies in that service.

Moreover, to the extent that the phrase "IN NO EVENT," found at the beginning of the fourth sentence, creates some ambiguity as to whether the exculpatory clause was intended to allow ECI to default on the payment of commissions owed its sales agents, that ambiguity must be construed against ECI.

9

And because the sentence is at best ambiguous, it must also be construed narrowly. See *Holmes*, supra at 477 (2). In other words, the fourth sentence of the exculpatory clause, particularly when read in the context of the entire clause and the contract as a whole, fails to clearly and unambiguously inform the sales agent that it is waiving its right to receive any payment under the contract, should ECI decide that defaulting on its payment obligation was in ECI's best interests. Accordingly, we find that the exculpatory clause does not bar actions such as this one, where a sales agent is attempting to recover the commissions owed it under the contract. See id.

Our interpretation of the exculpatory clause is supported by the rule that "a contract should be given a reasonable construction that will uphold the agreement rather than a construction that will render the agreement meaningless and ineffective." *McLendon*, supra at 60; see also *Azzouz v. Prime Pediatrics*, 296 Ga. App. 602, 605 (1) (a) (675 SE2d 314) (2009). The interpretation of the exculpatory clause advocated by ECI would, in essence, destroy the contract, as it would cause the agreement to fail for lack of mutual consideration. This is because under ECI's interpretation, the sales agent could potentially receive no compensation for performing under the contract. As this Court has previously held:

10

Where an instrument in writing, purporting to be a bilateral contract, contains mutual promises, which without more and when taken independently of certain subsidiary provisions in the instrument would render the instrument valid as a contract, such subsidiary provisions will not, unless their terms imperatively demand it, be given a construction that will nullify and completely destroy the entire obligations of either party under the instrument and thus render the instrument lacking in mutuality and void.

(Citation and punctuation omitted.) *Hardnett v. Ogundele*, 291 Ga. App. 241, 243-244 (1) (661 SE2d 627) (2008). Accordingly, we decline to interpret the exculpatory clause as relieving ECI of its obligation to pay 2W for its services. Id. See also *Homelife Communities Group v. Rosebud Park, LLC*, 280 Ga. App. 120, 122 (633 SE2d 423) (2006) (in interpreting ambiguities in a contract, "the construction which will uphold a contract in whole and in every part is to be preferred, and . . . a court should avoid an interpretation of a contract which renders portions of the language of the contract meaningless") (citations and punctuation omitted).

Finally, we are unpersuaded by ECI's reliance on our prior decision in *Imaging Systems Intl. v. Magnetic Resonance Plus*, 227 Ga. App. 641 (490 SE2d 124) (1997). That case involved an executory contract under which the appellee, MRP, would be paid a certain amount each month for servicing MRI machines owned by the

11

appellant, Imaging Systems. The contract was for a period of three years, but Imaging Systems terminated the contract early, and in violation of the contract's notice provisions. Id. at 641. MRP sued, seeking to recover all of the monthly payments it would have received if the contract had run for the entire term. This Court reversed the judgment entered in favor of MRP, finding that its claim represented lost profits, and was therefore barred by the contract's exculpatory clause.[3] Id. at 644-645. Based on this holding, ECI argues that we are obligated to find that the exculpatory clause in this case bars 2W's claim for direct damages. We disagree, as both the contract and the exculpatory clause at issue differ from those construed by the court in *Imaging Systems*.

Unlike the clause at issue here, which protects only ECI, the clause in *Imaging Systems* was mutual, in that it protected both parties from liability. This mutuality, together with the fact that the exculpatory clause had been drafted by MRP (the party seeking payment), supported the conclusion that MRP had knowingly waived its right to payment in the event of a breach by Imaging Systems. Additionally, the clause was

---

[3] That clause provided: "*LIMITATION OF LIABILITY* NEITHER THE CUSTOMER NOR MRP WILL BE LIABLE TO EACH OTHER OR ANY OTHER PARTY FOR ANY LOST PROFITS OR ANY INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT." *Imaging Systems*, supra at 642 (1).

short and direct; it was comprised of a single sentence. And its language left no doubt that it excluded recovery of damages of any kind, regardless of whether they were direct or consequential. Although the language relied on by ECI and the trial court in this case is similar to the language at issue in *Imaging Systems*, it represents but part of a single sentence in the exculpatory clause. As explained above, therefore, it must be read in conjunction with the other language found in the exculpatory clause. And when so read, it becomes clear that the purpose of the exculpatory clause was to protect ECI from damages resulting from its failure or inability to provide telecommunications services and equipment.

Moreover, nothing in the *Imaging Systems* contract provided that MRP would be entitled to payment after the contract was terminated, even if it was terminated wrongfully. Conversely, the contract at issue in this case expressly provides that, even after the contract's termination, 2W is entitled to continued commissions on accounts it brought to ECI while the contract was in effect. Furthermore, unlike the amounts sought by 2W, the amounts sought by MRP were not for services that had been provided, i.e., MRP was not seeking payments due for services already rendered. Finally, by interpreting the contract in that case as precluding MRP's claim, the court in *Imaging Systems* did not render the contract void for lack of consideration. Instead,

13

MRP received payment for all of the work it had done; the court's decision merely meant that MRP could not recover for work it had not yet performed and was no longer obligated to perform. Here, on the other hand, ECI is asking us to interpret the contract so as to allow it to avoid having to provide any consideration for services already rendered. We do not believe that *Imaging Systems* requires us to interpret the contract so as to eviscerate it.

3. We next address whether the trial court erred in finding that 2W failed to present sufficient evidence of its damages. In reaching this conclusion, the trial court found that under the terms of the contract, 2W did not earn a commission unless and until the amounts billed to the disputed accounts were actually paid by the end user. Because 2W only presented evidence of the amounts billed to those accounts, however, and failed to show that those bills had been paid, the trial court concluded that 2W failed to prove the amount of its damages. We disagree.

In finding that 2W did not earn a commission unless and until the disputed clients had paid their bills, the trial court relied on the testimony of Marvin Willesen, 2W's principal. On cross examination, Willesen responded affirmatively when asked whether, under his understanding of the contract, "[i]n order for [2W] to earn a commission the customer had to actually pay the bill." The trial court's reliance on

14

this testimony was error. While parol evidence as to a party's understanding of the contract "is admissible to explain ambiguities and to aid in the construction of contracts, it is not admissible to contradict or construe an unambiguous contract." (Footnotes omitted.) *Coleman v. Arrington Auto Sales & Rentals*, 294 Ga. App. 247, 249 (2) (669 SE2d 414) (2008). And as is discussed more fully below, the contract language at issue is not ambiguous. Thus, the trial court should have disregarded Willesen's testimony to the extent that Willesen stated he understood the contract to mean something other than what the contract said. *Safe Shield Workwear v. Shubee, Inc.*, 296 Ga. App. 498, 503 (3) (675 SE2d 249) (2009).

As noted above, with respect to commissions, the agreement provides, in relevant part:

> Within ten (10) business days after the End User invoices are distributed to End Users by ECI, ECI shall forward a monthly commission statement to Sales Agent [2W]. . . . Commission payments shall be paid by ECI to Sales Agent within thirty (30) days after the date of the corresponding monthly statement. ECI will hold all commission payments on any End User accounts that are more than 30 days past due. Once an End User's accounts [are] brought current, the supporting details and commission payments associated with that End User's account will be reflected on the Sales Agent's next monthly commission statement.

15

This language plainly and unambiguously establishes three facts. First, commission statements are forwarded to the sales agent 10 days after bills are sent to the customer; logically, therefore, commissions are earned by 2W at least by the time ECI sends out its bill to the customer. Despite ECI's argument to the contrary, there is nothing in the agreement that makes payment by the end user a condition precedent to the sales agent actually earning the commission. See *Choate Constr. Co. v. Ideal Elec. Contractors*, 246 Ga. App. 626, 628 (3) (541 SE2d 435) (2000) ("[c]onditions precedent, which are not favored in interpreting contracts, are created by language such as 'on condition that,' 'if,' and 'provided,' or by explicit statements that certain events are to be construed as conditions precedent) (citation omitted); *Gen. Steel v. Delta Bldg. Systems*, 297 Ga. App. 136, 139 (1) (676 SE2d 451) (2009) (where a "contract's terms are clear and unambiguous and do not clearly establish a condition precedent, a court cannot construe the contract to create one") (punctuation and footnote omitted).

Second, ECI has the right to withhold payment of any earned commission if the account on which that commission was earned is delinquent by more than 30 days. Once the account is brought current, however, ECI must pay the sales agent the previously earned commission. Third, it is ECI who bears the responsibility for

16

determining when accounts are past due and then informing the sales agent of that fact. Thus, unless and until ECI informs the sales agent that an account is past due, the sales agent may presume that it is entitled to payment of its earned commissions, i.e., the commissions of which it was notified 10 days after the customer was billed.

Given the plain language of the agreement, 2W's introduction of evidence showing the amounts that had been billed to the disputed accounts and the amount of commissions that would be owed on those bills was sufficient to prove the commissions it had earned, and was therefore presumptively owed, under the contract.[4] At that point, the burden shifted to ECI to show what portion, if any, of those earned commissions were not yet payable because the accounts were past due. It is axiomatic that when a plaintiff offers evidence establishing the amount it has earned under a contract and the defendant disputes that amount, the burden is on the

---

[4] We also note that 2W's evidence, which showed that ECI had served and billed the disputed accounts for more than four years, was sufficient to allow the jury to infer that the accounts had been kept current. As a general rule, jurors are authorized to make such reasonable inferences and reasonable deductions as ordinarily prudent persons would make in light of their every day experience and knowledge of human conduct and behavior. See *Canty v. State*, 318 Ga. App. 13, 14 (1) (733 SE2d 64) (2012); *Fortis Ins. Co. v. Kahn*, 299 Ga. App. 319, 323 (2) (a) (683 SE2d 4) (2009). In our view, the average juror will have had sufficient experience with telecommunications companies to allow them to determine whether such a company would continue to provide services to a customer who was more than 30 days delinquent on its account.

defendant to prove the amount by which the plaintiff's damages should be reduced. See *Leventhal v. Seiter*, 208 Ga. App. 158, 163-164 (6) (430 SE2d 378) (1993) (defendant failed to come forward with evidence showing why the amount of contractual damages should be reduced; therefore, no error in awarding the plaintiff the entire amount due); *Lamb v. Decatur Fed. Sav. & Loan Assn.*, 201 Ga. App. 583, 587 (2) (411 SE2d 527) (1991) (in a breach of contract action, the burden falls on the breaching party, as a defensive matter, to prove that plaintiff's damages should be reduced). ECI, however, came forward with no such evidence.

Given that 2W produced evidence from which the jury could calculate 2W's damages with a reasonable certainty, the trial court erred in directing a verdict in favor of ECI. See *Dickey v. Clipper Petroleum*, 280 Ga. App. 475, 479 (4) (634 S.E.2d 425) (2006) ("[a] trial court may not grant a motion for directed verdict based on a failure of proof of damages unless there is 'a complete absence of any competent evidence on this issue'") (citation and footnote omitted).

For the reasons set forth above, we reverse the orders of the trial court granting a directed verdict in favor of ECI and denying 2W's motion for a new trial. The case is remanded for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. Phipps, C. J., and Ellington, P. J., concur.*

18