**FOURTH DIVISION**
**ELLINGTON, P. J.,**
**BRANCH and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 10, 2016**

# In the Court of Appeals of Georgia

A16A1289. FIRMANI, et al. v. DAR-COURT BUILDERS, LLC, et al.

BRANCH, Judge.

Stewart and Marcia Weinhoff and their solely-owned corporation, Dar-Court Builders, LLC (collectively "the Weinhoffs"), filed suit in Cobb County Superior Court against a number of defendants,[1] including Dominic Firmani and his company, Firmani Pension Services ("FPS") (collectively "Appellants"), asserting claims for negligence, negligent misrepresentation, breach of fiduciary duty, constructive fraud, punitive damages, and attorney fees. The Weinhoffs contended that an error by

---

[1] Other defendants named in the lawsuit were the Weinhoffs' financial planner, William Baer; Baer's company, Baer Wealth Management, LLC; Stephen Toth, an actuary and pension planner; and Toth's company, National Pension Associates, LLC. All of the named defendants other than Firmani and FPS settled with the Weinhoffs prior to trial.

Firmani and FPS in drafting a Dar-Court-sponsored 412 (i) pension plan ("the Plan") resulted in significant damage to the Weinhoffs, in the form of additional tax liability, penalties and interest on that tax liability, and attorney fees and other costs associated with an IRS audit of the Plan. The case proceeded to trial and a jury found in favor of the Weinhoffs and against Firmani and FPS. Firmani and FPS now appeal from the orders of judgment entered against them, arguing that they are entitled to a new trial because a "script" used by the Weinhoffs' attorney for her direct examination of one of the Weinhoffs' witnesses was inadvertently submitted to the jury in violation of the continuing witness rule. Appellants further contend that the trial court erred in failing to grant their motions for a continuance and a mistrial, which were based on the Weinhoffs' production, during discovery, of redacted attorney fee bills and their subsequent introduction at trial of unredacted copies of those bills. Firmani and FPS also assert that the trial court erred in excluding certain testimony offered by their expert witness on damages and in barring testimony regarding an indemnification clause contained in the documents creating the Plan. For reasons explained more fully below, we find no error and affirm the orders of judgment. We also deny the Weinhoffs' request that we impose sanctions against Firmani and FPS for a frivolous appeal.

Viewed in the light most favorable to the jury's verdict, *Freese II, Inc. v. Moses*, 301 Ga. App. 793, 794 (689 SE2d 98) (2009), the record shows that a 412 (i) plan is a defined-benefit pension plan created under §412 (i) of the Internal Revenue Code, and funded entirely with two types of insurance products: life insurance policies and annuity contracts. The contributions to this type of pension plan, therefore, are the premiums paid for the insurance products. Funding a 412 (i) pension plan provides tax benefits to both the employer sponsoring the plan and the employee participating in the same; the employer gets to deduct the insurance premiums paid as contributions to the plan, while the employee reduces his salary (and therefore his taxable income) to fund the premiums. The IRS, however, limits the amount of life insurance that can be purchased to fund a 412 (i) plan. These limits serve to cap the amount of tax deductions available to the employer sponsoring the plan, and they also prevent such a plan from having an excessive amount of life insurance if a participant dies.[2] When, as in this case, a 412 (i) plan is funded with whole life insurance, the premiums paid for that insurance may not exceed 66 2/3

---

[2] An excessive amount of life insurance would be an amount that would provide a death benefit in excess of the amount that could be paid out under the terms of the pension plan – i.e., it would result in the plan having a surplus of assets.

percent "of the theoretical contribution generated when determining the Theoretical Individual Level Premium Reserve."[3]

William Baer served as the Weinhoffs' financial advisor, and as part of his financial planning services, Baer sold insurance products. In 2002, Baer approached the Weinhoffs regarding the tax benefits of a 412 (i) plan and recommended that they invest in the same. The Weinhoffs thereafter decided to have Dar-Court sponsor such a plan, with Stewart Weinhoff as the sole participant and Marcia Weinhoff as Stewart's beneficiary. Baer then worked with Stephen P. Toth, an actuary and pension planner, and Toth's company, National Pension Associates, to design the Plan and determine its funding requirements. The Plan was funded with Pacific Life products, and Baer and Toth shared the commissions generated on those products. Firmani and FPS were hired to serve as the Plan administrator. In that role, Firmani and FPS drafted the necessary documents (the "Plan Documents") and performed certain

---

[3] The "Theoretical Individual Level Premium Reserve," or "ILP," is an actuarial funding method, and it represents the amount of pension funds that would be available at the time of a participant's death "if, for each year of plan participation, a contribution was made on behalf of the participant equal to the theoretical contribution." MELANIE N. ASKA & JAMES E. TURPIN, PENSION DISTRIBUTION ANSWER BOOK §12:69 (2016 ed.) The "theoretical contribution" represents "the amount of the contribution that would have been made on behalf of the participant, using the ILP funding method from the age at which participation began to normal retirement age, to fund the participant's entire retirement benefit . . . ." Id.

administrative duties, including auditing the Plan on an annual basis, preparing the annual forms required by the IRS, and preparing the Plan's tax return.

At the time of the Plan's creation, Stewart Weinhoff had applied for life insurance coverage in the amount of $1.25 million, with annual premiums of $75,000. Firmani and FPS drafted the Plan Documents based on this preliminary information. Thus, the Plan as drafted by Appellants in October 2002 provided that the amount of insurance on Stewart Weinhoff's life "shall be . . . the amount purchased by a premium equal to 49% of the theoretical contribution generated when determining the theoretical individual level premium reserve." The 49% cap was well below the maximum cap of 66 2/3% allowed by IRS regulations, and Firmani testified that he chose the 49% figure for two reasons. First, the anticipated annual premium of $75,000 fell below the 49% cap, and second, in Firmani's experience, the IRS was less likely to audit a plan when the cap was less than 66 2/3%.

After Stewart Weinhoff completed the underwriting process, he was qualified for a $1.5 million life insurance policy with annual premiums of $105,000, and that was the policy that issued. The information regarding the increase in both policy coverage and premiums was forwarded to Firmani in December 2002, and he directed the FPS employee handling the Plan to amend the Plan Documents accordingly. FPS,

5

however, did not amend the Plan Documents to reflect the increased amount of life insurance and the resulting increase in premiums – i.e., Appellants did not amend the Plan to raise the 49% cap for life insurance premiums. Although the $105,000 annual premium fell below the 66 2/3% cap permitted by IRS regulations, the larger premium exceeded the 49% cap by approximately $10,000 per year. Thus, the life insurance policy that issued exceeded the benefits allowed under the terms of the Plan Documents and resulted in the Plan — as created by Firmani and FPS — being overfunded. Had the Plan been amended to provide for a cap of 66 2/3%, the premium paid would have complied with the terms of the Plan Documents.

In 2008, the IRS audited Dar-Court's 412 (i) plan and found that it violated the tax code because although the life insurance premiums fell below the 66 2/3% cap set by IRS regulations, they exceeded the 49% cap set by the Plan Documents. The IRS therefore deemed the plan a "listed transaction" (i.e., an illegal tax shelter), and assessed the Weinhoffs back taxes and penalties of approximately $1.9 million, exclusive of interest. The Weinhoffs retained Philip Bush, a tax lawyer specializing in employee benefits, to represent them before the IRS. Bush was eventually able to negotiate a settlement with the IRS, under which the Weinhoffs were required to pay $459,757.20 in taxes and penalties and $116,168.69 in interest.

The Weinhoffs brought this lawsuit in an effort to recover the amounts paid to the IRS in taxes, penalties, and interest, as well as the professional fees and costs they incurred in appealing the IRS's initial ruling that they owed $1.9 million. During discovery, the Weinhoffs produced copies of Bush's attorney fee bills, but redacted portions of the same, claiming that certain entries were protected by the attorney-client privilege. Additionally, during his deposition, Bush testified that because the attorney-client privilege had been asserted as to the redacted entries, he would not answer questions regarding those entries. At trial, however, the Weinhoffs sought to prove the amount of fees paid to Bush as a result of the IRS audit by introducing "largely unredacted" copies of his bills and questioning him regarding the same.[4] Firmani and FPS objected to this evidence on the grounds that it had not been made available during discovery, but the trial court overruled the objection.

Stewart Weinhoff testified that he and his wife had incurred a total of $214,711.23 in professional fees and other expenses in appealing the IRS's original

_____

[4] At trial, counsel for the Weinhoffs stated that during the discovery period, Bush believed that the Weinhoffs could have some lingering issues with the IRS, and he therefore believed it necessary to keep the attorney-client privilege intact with respect to certain work he had done for them. By the time of trial, however, Bush believed that all issues with the IRS had been resolved, and therefore unredacted versions of his bills could be produced.

assessment of back taxes and penalties and in negotiating a settlement with the IRS. This amount included $144,723.73 in attorney fees and $24,987.50 in actuarial fees. On cross-examination, defense counsel attempted to question Weinhoff about an indemnity clause found in the Plan Documents. The Weinhoffs objected to this line of questioning and the trial court sustained the objection, ruling that the indemnification clause could not be interpreted to require the Weinhoffs to indemnify Firmani and FPS for their own negligence.

During their case, Firmani and FPS presented the testimony of Michael Thompson, a CPA who was qualified as an expert in forensic accounting and damages calculations. Firmani sought to introduce testimony from Thompson that the actual damages suffered by the Weinhoffs totaled only $121,752, as well as testimony as to Thompson's method for calculating these damages. Prior to jury selection, the Weinhoffs made an oral motion in limine seeking to prevent Thompson's testimony on these issues. After hearing Thompson's proffered testimony outside the presence of the jury, the trial court granted the motion in limine.

The jury found in favor of the Weinhoffs and awarded them $735,650 in compensatory damages, but further found that the Weinhoffs were not entitled to punitive damages or to an award of attorney fees under OCGA § 9-15-14. The jury

8

apportioned liability as follows: 15% to Firmani; 40% to FPS; 25% to Baer; 15% to Baer's company, National Pension Associates; and 5% to the Weinhoffs. The trial court entered judgment on the jury's verdict, and Firmani and FPS now appeal from the orders of judgment entered against each. Additional facts relevant to this appeal are set forth below.

1. In their first enumeration of error, Firmani and FPS argue that they are entitled to a new trial because of the inadvertent submission to the jury of a document that was not introduced into evidence at trial. The record shows that before the exhibits were sent to the jury room, the trial court gave counsel for all parties the opportunity to review the exhibits and offer any objections. None of the parties objected, and counsel for the parties affirmatively stated that each agreed as to the exhibits and the verdict form being supplied to the jury. One of the exhibits that went out with the jury was plaintiffs' exhibit 88, which was a compilation of the bills the Weinhoffs had received from Bush's law firm. The appellate record indicates, however, that two additional items were attached to plaintiff's exhibit 88 at the time it went to the jury. One of these items was a document created by plaintiffs' counsel

for her use in conducting a direct examination of Bush.[5] This outline set forth the topics and questions that counsel counsel covered with Bush during his testimony. According to Appellants, these attachments were inadvertent, and were not discovered until their counsel reviewed the appellate record.

Firmani and FPS contend that the submission to the jury (as part of plaintiffs' exhibit 88) of the outline of plaintiffs' counsel's direct examination of Bush violated the continuing witness rule. See *McDaniel v. McDaniel*, 288 Ga. 711, 717 (3) (a) (707 SE2d 60) (2011) (the continuing witness rule prohibits the submission to the jury of any document that could be viewed as a substitute for a witness's testimony). Appellants further argue that because this violation of the continuing witness rule had the potential to "unduly influence" the jury, they are entitled to a new trial. We disagree.

Regardless of whether the inadvertent submission of this outline to the jury violated the continuing witness rule, the record shows that defense counsel "reviewed the exhibits prior to their submission to the jury and voiced no objection. Accordingly, this issue has not been preserved for our review." *Smith v. Stacey*, 281

---

[5] The other item attached to plaintiff's' exhibit 88 was a DVD of the videotaped deposition of Stephen Toth, which had been introduced into evidence and played at trial.

10

Ga. 601, 602-603 (2) (642 SE2d 28) (2007) (citation and punctuation omitted). See also *Sanders v. State*, 246 Ga. 43 (2) (268 SE2d 628) (1980) (trial court did not err in submitting exhibits to jury where counsel was given the opportunity to review the exhibits and thereafter failed to object to their submission). Moreover, given that counsel expressly approved the exhibits as compiled, counsel helped to induce any error that occurred, and Firmani and FPS cannot base their appeal on any such induced error. See *Dyals v. Dyals*, 281 Ga. 894, 896 (3) (644 SE2d 138) (2007) (where counsel expressly approved of the exhibits "before allowing them to go out with the jury," any error in submitting the exhibits to the jury was induced by counsel's conduct and could not serve as the basis for an appeal).

2. Firmani's and FPS's second claim of error relates to the Weinhoffs' introduction into evidence of unredacted bills they received from Bush's law firm, which the trial court allowed despite the fact that the Weinhoffs had produced only redacted versions of those bills during discovery. Georgia's Civil Practice Act obligates parties to provide all information or evidence in their possession that is responsive to a discovery request from the opposing party, provided such evidence is relevant and not unduly burdensome. See OCGA § 9-11-26 (b). Additionally, the law imposes a duty on a party to supplement its discovery responses "when new

information comes to its attention and the undisclosed matter may be a source of 'surprise' at trial to the party making the discovery." *Shepherd Interiors v. City of Atlanta*, 263 Ga. App. 869, 870 (1) (589 SE2d 640) (2003) (citation and punctuation omitted). See also OCGA § 9-11-26 (e). "When a party claims, during the course of trial, that he has been 'surprised' by evidence of a potentially 'critical' nature which should have been disclosed under [the] discovery [rules]," the options available to the party so surprised are to seek a brief continuance or postponement of trial to explore the newly-produced evidence, or to move for a mistrial. Id. (citation and punctuation omitted). See also *Infinite Energy v. Cottrell*, 295 Ga. App. 306, 309 (3) (671 SE2d 294) (2008).

Citing this law, Firmani and FPS argue that the unredacted attorney fee bills from Bush's firm and Bush's testimony regarding the same constituted "surprise" evidence – i.e., it was evidence that the Weinhoffs were obligated to produce prior to trial. Thus, Appellants contend that the trial court erred when it denied their purported motions for a continuance and/or for a mistrial based on the introduction of the unredacted attorney-fee bills. The record, however, shows that Appellants never sought either a continuance or a mistrial.

12

Appellants filed a pretrial motion in limine seeking to prevent the Weinhoffs from introducing into evidence unredacted versions of Bush's bills because the now-unredacted entries had not been made available during discovery. Firmani and FPS also sought to prevent any testimony regarding the previously redacted entries. The admitted goal of this motion in limine was to prevent the Weinhoffs from recovering any of Bush's fees as to which they had previously asserted the attorney-client privilege. The trial court heard this motion in limine before the jury was impaneled and reserved ruling on the same. At that time, however, Firmani and FPS did not move for a continuance based on the possibility that the redacted bills would be allowed into evidence. Instead, their attorney conceded that the admission of these bills into evidence was a possibility. Specifically, Appellants' counsel stated that he understood no ruling had occurred but noted that if "Mr. Bush were to come in and waive the privilege, I would just ask that I get a copy of unredacted bills prior to him taking the stand so I can prepare to cross-examine him." Both the trial court and counsel for the Weinhoffs agreed, and it is undisputed that counsel for Firmani and FPS received unredacted versions of Bush's bills at least two days before Bush took the stand.

13

Immediately before Bush testified, Firmani and FPS again objected to the introduction of the unredacted fee bills or any testimony concerning the same. At that time, their lawyer noted that the introduction of such evidence would require a continuance, as it had not been made available during discovery. During this discussion, Appellants' counsel stated, "*I don't want [a continuance] to happen*," and he did not move for a continuance. In response, the trial court stated its belief that because the jury had been impaneled, Firmani and FPS would be required to seek a mistrial rather than a continuance. A short time later, during Bush's testimony as to his fees, the Weinhoffs introduced copies of the bills they had received from Bush's firm, and these copies were "largely unredacted." Appellants objected to the introduction of this evidence, with trial counsel stating that he "was not prepared to cross-examine [Bush] if there is going to be a waiver of [the] privilege," and that he could not ask for the first time in front of the jury questions that Bush had not been allowed to answer at his deposition due to the assertion of such privilege. Firmani and FPS again requested that the Weinhoffs only be allowed to introduce copies of the redacted bills that had been produced during discovery. The trial court overruled Appellants' objection to the unredacted bills and Bush's testimony regarding the same, and again stated that it would rule on any specific objections related to the

14

previous assertion of privilege as Bush's testimony progressed.[6] Firmani and FPS, however, did not request a mistrial at that time; nor did their attorney request any type of continuance to prepare for his cross examination of Bush. Instead, counsel subsequently declined to cross-examine Bush regarding his bills, other than to establish that the Weinhoffs had previously asserted the attorney-client privilege as to portions of most, if not all, of those bills.

Given their failure to move for either a continuance or a mistrial, Firmani's and FPS's second claim of error is procedurally barred. See *Watts v. State*, 265 Ga. 888 (2) (463 SE2d 696) (1995) (where a party neither moved for a continuance nor objected to the trial court's failure to order a continuance, his claim of error based on the lack of a continuance was procedurally barred). To preserve an issue for appeal,

---

[6] We note that the trial court's refusal to exclude this evidence is supported by relevant law. See *Infinite Energy*, 295 Ga. App. at 309 (3) ("When a party proffers at trial evidence which should have been disclosed during discovery, exclusion of the proffered evidence is not an authorized sanction. The proper sanction is to order a postponement or a mistrial.") (punctuation omitted). See also *Trustees of Trinity College v. Ferris*, 228 Ga. App. 476, 480 (6) (491 SE2d 909) (1997) (noting that where a plaintiff produces surprise evidence at trial, "the court should allow a postponement of the trial for a sufficient length of time to enable the defendant to interview the witness, check the facts to which he would testify, and, if indicated, arrange a secure rebuttal evidence or to impeach him. The trial judge should exercise his discretion as to the length of time that would be necessary for counsel.") (citation and punctuation omitted).

15

a party is required to make a timely motion or objection – i.e., a motion or objection that is contemporaneous with the ruling or the introduction of the evidence to which they are objecting. See *Frazier v. State*, 249 Ga. App. 463, 465 (4) (549 SE2d 133) (2001). See also *McConnell v. Akins*, 262 Ga. App. 892 (1) (586 SE2d 688) (2003) ("[i]f no opportunity is given the court to cure any alleged error, it is waived") (citation omitted). Here, while Appellants' counsel and the trial court discussed the potentially available remedies of a continuance and a mistrial, Firmani and FPS never affirmatively made any motion related to these discussions. And despite Appellants' argument to the contrary, those discussions, which took place before the evidence at

issue was introduced, were insufficient to preserve this issue for appeal.[7] See *Dagne v. Schroeder*, 336 Ga. App. 36, 42-43 (5) (783 SE2d 426) (2016).

3. Firmani and FPS further contend that the trial court erred in excluding the testimony of their damages expert as to his opinion of the Weinhoffs' damages and his method of calculating those damages. With respect to this claim of error, we note that the admission of evidence is a matter resting within the sound discretion of the trial court, and we will not disturb the exercise of that discretion absent evidence of

_____

[7] In their brief, Firmani and FPS argue that the unredacted invoices could have led to the discovery of additional relevant evidence because they constituted a waiver of the attorney-client privilege with respect to the legal matters identified on the bills. Specifically, Appellants argue that "[b]y producing largely unredacted invoices at trial, [the Weinhoffs] opened the door to the rest of [Bush's attorney] file" with respect to the Weinhoffs' dispute with the IRS. Appellants' brief, however, cites no legal authority to support the proposition that the production of the unredacted bills constituted a wholesale waiver as to the entirety of Bush's legal files. See *Waldrip v. Head*, 272 Ga. 572, 578-579 (532 SE2d 380) (2000) (where a defendant files a habeas corpus petition based on ineffective assistance of counsel he has waived the attorney-client privilege to the extent necessary to allow the State to defend against that petition); *Felts v. State*, 244 Ga. 503, 505 (260 SE2d 887) (1979) (holding that where defendant had testified without objection at his previous trial that he had lied to his attorney about where he had received the gun used in the crime, he waived the attorney-client privilege as to that lie, but limiting the waiver to that statement). Moreover, although Appellants speculate in their brief that Bush's representation of the Weinhoffs "may have included . . . discussions with actuaries regarding opinions as to what issues existed with the Plan, who should bear responsibility for those issues, and whether the [Weinhoffs] responded reasonably to settlement overtures[,]" they point to nothing in the unredacted bills that supports this speculation.

17

its abuse. *Smith v. CSX Transp.*, 325 Ga. App. 314, 318 (751 SE2d 604) (2013). Similarly, the question of whether an expert witness "has stated a proper basis for expressing an opinion is for the trial court[,]" and we also review a trial court's ruling on this issue for abuse of discretion. *Sevostiyanova v. Tempest Recovery Svcs.*, 307 Ga. App. 868, 872 (2) (705 SE2d 878) (2011) (citation and punctuation omitted). We find no abuse of discretion here.

As noted above, Thompson testified outside the presence of the jury that, in his opinion, the Weinhoffs had suffered actual damages of only $121,752. Thompson explained his method for calculating damages, stating that he began by calculating three numbers: the damages suffered by the Weinhoffs as a result of the IRS audit (which Thompson conceded totaled approximately $760,000); the benefits the Weinhoffs would have received if, during the relevant time frame, the Plan had been funded as originally planned (i.e., with a life insurance policy of $1.25 million at an annual premium of $75,000); and the benefits the Weinhoffs in fact received during the relevant time frame as a result of funding the Plan with a $1.5 million life insurance policy at an annual premium of $105,000. In Thompson's calculations, the "benefits" the Weinhoffs received included the tax benefits they received as a result of Dar-Court funding the Plan; the cash value of the life insurance policy on Stewart

18

Weinhoff; and the theoretical return the Weinhoffs would have received on their tax savings, which Thompson assumed the Weinhoffs would have reinvested.[8] And under Thompson's calculations, the benefits that the Weinhoffs actually received as a result of the Plan being funded with a larger insurance policy at a higher premium were greater than the benefits they would have received if Dar-Court had funded the Plan as originally intended, with a premium that fell below the 49% cap contained in the Plan Documents. Thompson therefore calculated the difference between these two sets of benefits – i.e., he subtracted the theoretical benefits the Weinhoffs would have received if the Plan were funded with a $75,000 annual premium from the benefits they actually received by funding the Plan with a $105,000 premium. Thompson then took the resulting number and added it to the tax deduction the Weinhoffs had taken for some of the attorney fees they paid in defending themselves in the IRS action. Thompson then subtracted this total amount from the taxes, penalties, interest, and other costs the Weinhoffs incurred as a result of the IRS audit.

---

[8] In calculating this theoretical return on the presumed reinvestment of the Weinhoffs' tax savings, Thompson assumed a return of 2.5%. This amount represented the return the Weinhoffs would have received on a 10-year treasury bond, which Thompson explained represented the most conservative investment available.

The theory underlying Thompson's method of calculating damages was that an "error" had occurred when the Weinhoffs' financial advisor and insurance agent (Baer) "overfunded" the Plan with the higher life insurance policy (and thereafter failed to inform Firmani and FPS). He reasoned, therefore, that Firmani and FPS were entitled to offset the "unanticipated" benefits generated by this error against the damages the Weinhoffs suffered as a result of the IRS audit. The flaw in Thompson's decision to subtract from the Weinhoffs' damages the "unanticipated benefits" they supposedly received as a result of funding the Plan at a higher rate is that it misstates the cause of the injury sustained by the Weinhoffs. Specifically, Thompson's calculation assumes that the Weinhoffs' damages were caused not by Appellants' error in failing to amend the Plan Documents, but by an error by Baer in "overfunding" the Plan with an inflated amount of life insurance. Viewing the evidence in the light most favorable to the jury's verdict (as we are obligated to do), the record shows that the level at which the Plan was funded did not result from an error. Instead, after Stewart Weinhoff qualified only for the life insurance policy with a higher premium, the Weinhoffs decided to fund the Plan at that premium. Thus, the Weinhoffs contended, and the evidence showed, that the Weinhoffs were entitled to receive the tax and insurance benefits associated with the $1.5 million life insurance

policy funded with an annual premium of $105,000. The Weinhoffs were injured when, through the negligence of Firmani, FPS, and Baer, the Plan documents were not amended to increase the 49% cap on life insurance premiums.[9] In other words, the benefits generated when the Plan was funded with an annual life insurance premium of $105,000 were not unanticipated by the Weinhoffs. And "but for" the negligence of Appellants' and Baer (in failing for a number of years to ensure that the Plan Documents accurately reflected the life insurance policy that actually issued) the Weinhoffs would have received those benefits.

As the foregoing demonstrates, Thompson's damages calculations would not have allowed the Weinhoffs to recover all of the damages they suffered as a result of Appellants' failure to amend the Plan Documents. Given this fact, and because Thompson's theory of causation was not supported by the evidence, the trial court did not err in excluding Thompson's testimony regarding the difference in benefits between a theoretical plan funded with a $75,000 annual life insurance premium and the Weinhoffs' actual plan (which was funded with a $105,000 annual premium). See

---

[9] Notably, Firmani acknowledged in his testimony that the Plan Documents should have been amended to increase the life insurance premium cap to the maximum 66 2/3% allowed under IRS regulations, and had they been so amended, the Weinhoffs "probably" would not have been penalized by the IRS.

21

*John Thurmond & Assoc. v. Kennedy*, 284 Ga. 469 (1) (668 SE2d 666) (2008) (as a general rule, "damages are intended to place an injured party, as nearly as possible, in the same position they would have been if the injury had never occurred"); *Metro. Atlanta Rapid Transit Auth. v. Green Intl.*, 235 Ga. App. 419, 422 (1) (509 SE2d 674) (1998) (a party may offer expert testimony as to damages, but the facts relied on by the expert in calculating damages must be "within the bounds of the evidence").

Furthermore, the Appellants' argument that the tax deduction the Weinhoffs received as a result of their dispute with the IRS could be used to offset their damages in this case finds no support in the law. Georgia law is clear that in tort actions, "a benefit bestowed on the injured party should not be shifted so as to create a windfall for the tortfeasor." *Broda v. Dziwura*, 286 Ga. 507, 508 (689 SE2d 319) (2010) (citation omitted). "It is the tortfeasor's responsibility to compensate for all harm that he causes, [and that responsibility is] not confined to the net loss that the injured party receives." *Amalgamated Transit Union Local 1324 v. Roberts*, 263 Ga. 405, 406 (434 SE2d 450) (1993) (citation and punctuation omitted). Thus, "[i]f a windfall must be had, it will inure to the benefit of the injured party rather than relieve the wrongdoer of full responsibility for his wrongdoing." *Broda*, 286 Ga. at 508 (citations omitted). Additionally, although Georgia courts have not previously addressed this question,

22

we note that the "general rule" recognized by other states is that in a case involving financial damages, those "damages should not be reduced by the amount of money that [the plaintiff] was able to save by deducting the loss . . . on her tax returns."[10] *Burdett v. Miller*, 957 F2d 1375, 1383 (7th Cir. 1992) (applying Illinois law). See also *Fullmer v. Wohlfeiler & Beck*, 905 F2d 1394, 1402 (V) (10th Cir.1990) (applying Utah law); *Western-Realco Limited Partnership 1983-A v. Harrison*, 791 P2d 1139, 1147 (II) (Colo. App. 1989); *Coty v. Ramsey Assoc.*, 546 A2d 196, 204 (III) (B) (Vt. 1988); *Danzig v. Grynberg & Assoc.*, 161 Cal. App.3d 1128, 1139-1140 (III) (1984).

In light of the foregoing, we find no abuse of discretion by the trial court in excluding Thompson's testimony as to his opinion of the damages suffered by the Weinhoffs and his method for calculating the same.

4. Appellants contend that the trial court erred in excluding evidence of an indemnity provision found in the Plan Documents drafted by Firmani and FPS because this provision would have allowed the jury to consider "whether FPS's role as a plan administrator subject to an indemnity provision subjected it to different

---

[10] Moreover, Thompson acknowledged during his testimony that the tax consequences to the Weinhoffs of any damages award they were covered in this action were unknown.

consideration than that given to Toth and Baer — [the financial professionals and] insurance salesman who sold the Plan, ruined the Plan with excess insurance, and walked away." We find no error.

Because the indemnity clause is a contractual provision, its interpretation is a question of law, and we therefore review the trial court's ruling on this issue de novo. *Willesen v. Ernest Communications*, 323 Ga. App. 457, 459 (1) (746 SE2d 755) (2013). And under Georgia law, "the words of a contract of indemnification must be construed strictly against the indemnitee . . . [a]nd every presumption is against [an] intention to indemnify." *Svc. Merchandise Co. v. Hunter Fan Co.*, 274 Ga. App. 290, 292 (1) (617 SE2d 235) (2005) (punctuation and footnotes omitted). Accordingly, we will not interpret "contractual indemnities [to] extend to losses caused by an indemnitee's own negligence unless the contract expressly states that the negligence of the indemnitee is covered." *Ryder Integrated Logistics v. BellSouth Telecommunications*, 281 Ga. 736, 737-738 (2) (642 SE2d 695) (2007) (punctuation omitted). See also *Emergency Professionals of Atlanta v. Watson*, 288 Ga. App. 473, 477 (2) (654 SE2d 434) (2007) ("unless a contract for indemnification explicitly and expressly states that the negligence of the indemnitee is covered, this Court will not interpret such an agreement as a promise to save the indemnitee from his own

24

negligence") (footnote omitted). Here, the indemnity clause did not "expressly, plainly, clearly, and unequivocally state that [Dar-Court] would indemnify [Appellants] from [their] own negligence." Id. (footnote omitted). Instead, the clause provided:

> ***Insurance and Indemnity.*** The Employer [Dar-Court] may purchase . . . and keep current as an authorized expense liability insurance for the Plan, its Fiduciaries, and any other person to whom any financial or other administrative responsibility with respect to the Plan . . . is allocated or delegated, from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act or omission to act in connection with the performance of the duties, responsibilities and obligations under the Plan. . . ; *provided, that any such insurance policy purchased with Plan assets permits the subrogation by the Insurer against the Fiduciary in the case of breach by such Fiduciary*. Unless otherwise determined and communicated to affected parties by the Employer, the Employer shall indemnify and hold harmless each such person, other than a corporate trustee, for and from any such liabilities, costs and expenses which are not covered by any such insurance, except to the extent that any such liabilities, costs or expenses are judicially determined to be due to the gross negligence or willful misconduct of such person. No Plan assets may be used for any such indemnification.

(Emphasis supplied.)

We acknowledge that the wording of the indemnification provision, which references indemnification against "against any and all liabilities, costs and expenses incurred by [the indemnitee] . . . in connection with the performance of [their] duties, responsibilities and obligations under the Plan," might at first appear to support Appellants' position. However, the indemnification clause also makes clear that it was not intended to shield Firmani and FPS from liability resulting from breach of their fiduciary duties, even when such a breach resulted from mere negligence. Given this fact, and because the indemnification clause "is bereft of any express or explicit statement about coverage for the [Appellants'] own negligent acts or omissions [,]" Dar-Court cannot be required to indemnify FPS and Firmani for their own negligence. *Park Pride Atlanta v. City of Atlanta*, 246 Ga. App. 689, 691 (1) (541 SE2d 687) (2000). See also *Ryder Integrated Logistics*, 281 Ga. at 738 (2). Accordingly, given that the indemnification clause did not require Dar-Court to indemnify FPS and Firmani for their own negligent acts, the trial court did not err in excluding evidence related to that clause.

For the reasons set forth above, we affirm the orders of judgment entered against Firmani and FPS by the trial court. We deny the Weinhoffs' request that we impose sanctions against Firmani and FPS for a frivolous appeal.

*Judgment affirmed. Ellington, P. J., and Mercier, J., concur*.

26