**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BRANCH and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 31, 2017**

# In the Court of Appeals of Georgia

A17A0937. VIAD CORP v. UNITED STATES STEEL CORPORATION.

BRANCH, Judge.

From 1908 to 1937, the predecessors of appellant Viad Corp produced sulfuric acid and a waste product known as "pyrite cinders," which are mostly iron oxide but also contain lead and arsenic, at a 25-acre plant in Albany, Georgia. In April 1968, Viad's predecessors agreed to sell the property to U. S. Steel (in a "Sale Contract"), with the sale memorialized on June 29, 1968 (in an "Assumption Agreement"). Under the reciprocal indemnification provisions of the Assumption Agreement, Viad's predecessors agreed to indemnify U.S. Steel's predecessor for liabilities "result[ing] from acts, omissions, or obligations" of the predecessors "prior to the close of business" on January 27, 1968, whereas U. S. Steel's predecessor agreed to indemnify

Viad's predecessors for liabilities "arising out of the ownership or operation" of the property after the date of the Assumption Agreement. After the State of Georgia required both Viad and U. S. Steel to pay for environmental remediation of the property, which had taken place by 2006, these parties sued each other for indemnification, and the trial court later granted summary judgment to U. S. Steel.

On appeal from that judgment, Viad argues that the trial court misinterpreted the 1968 agreements, that material questions of fact remain under a correct construction of them, and that summary judgment was improperly granted before the completion of material discovery. Because we conclude that the 1968 agreements do not indemnify U. S. Steel for the consequences of its own negligence, if any, after taking possession of the property, we reverse in part, vacate in part, and remand for further proceedings.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case.

*Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

Although the parties disagree about the history of contamination at the Albany site, the facts relevant to their indemnification claims are not in dispute. Between approximately 1908 and 1968, the property at issue was owed by Viad's predecessors, including Armour and Company and Armour Agricultural Chemical Company (AACC) ("the Armour entities"). From 1908 to 1937, Armour manufactured sulfuric acid on the property by burning pyrite in a closed system, which released the acid and also created a magenta-colored ash residue, known as "pyrite cinders," consisting of sand and gravel-sized particles. These cinders are composed primarily of iron oxide but also contain traces of other materials, including arsenic and lead. Once created, the cinders were removed from the closed system and stored in above-ground piles on the property. In 1937 or so, Armour changed its manufacturing processes and stopped producing the cinders.

USS Agri-Chemicals acquired the property in June 1968 and merged into U. S. Steel in 1969, at which time the property was deeded to U. S. Steel. The Sale Contract, executed in April, had provided in relevant part that "U. S. Steel does not assume and will not be liable for and [the Armour entities] expressly agree to remain liable for and discharge all liabilities of any nature whatsoever *which are not*

3

*expressly assumed* by U. S. Steel." (Emphasis supplied.) The Sale Contract went on to specify that

> [w]ithout in any way affecting the generality of the limitations on the obligations and liabilities to be assumed by U. S. Steel hereunder . . . , it is agreed that U. S. Steel *shall not assume nor agree to pay, perform, fulfull, or discharge, nor to indemnify and hold harmless [the Armour entities] with respect to any of the following debts, liabilities, and obligations* of [the Armour entities, which] shall indemnify and hold harmless U. S. Steel from and against any claim, loss, damage, cost, or expense of any kind or character arising out of or resulting from the following Excluded Liabilities:
> (i) *Any debts, liabilities and obligations* of [the Armour entities] . . . which were *attributable to periods prior to the close of business on January 27, 1968, or which result from acts, omissions, or obligations of [the Armour entities] prior to such date*, including but not limited to any litigation pending as of the close of business on January 27, 1968 or thereafter instituted with respect to any such debt, liability or obligation[.]

(Emphasis supplied.) The Sale Contract also promised, however, that U. S. Steel would deliver "an instrument of assumption . . . under the terms of which U. S. Steel shall assume and agree in due course" to indemnify the Armour entities for "[a]ll debts, liabilities, and obligations" of the Armour entities "attributable to the period after the close of business on January 27, 1968 and prior to the Closing Date" as well

4

as "attributable to the period on or after the Closing Date and *aris[ing] from acts or omissions of U. S. Steel* occurring *on or after* said date." (Emphasis supplied.)

As envisioned in the Sale Contract, and referring to that document,[1] Paragraph 1 (b) of the Assumption Agreement states the specific extent to which U. S. Steel indemnifies the Armour entities:

> WHEREAS, . . . U.S. Steel agreed [in the Sale Contract] . . . to indemnify and hold harmless [the Armour entities] . . . from and against any claim, loss, damage, cost or expense of any kind or character arising out of or resulting from debts, liabilities and obligations of [the Armour entities] being assumed herein[,] . . .
>
> 1. USS [Agri-Chemicals], as part of the consideration for the sale and transfer to it by [the Armour entities] of the aforesaid Net Assets, does hereby assume and agree to pay, perform, fulfill and discharge the debts, liabilities, and obligations of [the Armour entities] *(except Excluded Liabilities hereinafter listed)*, primary or secondary, fixed or contingent, *which exists on the Closing Date* as follows: . . .
>
> (a) All debts, liabilities and obligations of [the Armour entities,] other than Excluded Liabilities are herein set forth, to the extent not covered by insurance, incurred in connection with the Net Assets sold and

---

[1] Although U. S. Steel asserts that only the Sale Contract governs the question of indemnification, that Contract specifically contemplates the execution of the Assumption Agreement, which was the parties' final expression on the subject, and U. S. Steel has not pointed to or explained any variance between the two agreements' terms.

transferred . . . to the extent that the same are attributable to the period after the close of business of January 27, 1968, and prior to the close of business on the Closing Date; [and]

(b) *All debts, liabilities, and obligations (actual or alleged) arising out of the ownership or operation of the Net Assets and business of [the Armour entities]* . . . to the extent the same are attributable to the period after the close of business on the Closing Date and *arise from acts or omissions of USS [Agri-Chemicals] occurring after the close of business on said date*[.]

(Emphasis supplied.) Paragraph 5 of the Assumption Agreement also specified the extent to which the Armour entities would indemnify U. S. Steel in the "Excluded Liabilities" referenced in Paragraph 1:

5. Without in any way affecting the generality of the limitations on the obligations and liabilities assumed by USS [Agri-Chemicals] hereunder, it is agreed that . . . [the Armour entities] . . . *shall indemnify and hold harmless* USS [Agri-Chemicals] from and against *any claim, loss, damage, cost or expense of any kind or character arising out of or resulting from* the following Excluded Liabilities:

(a) *Any debts, liabilities and obligations of [the Armour entities]*, including taxes, fees or other charges imposed by any governmental entity, which were *attributable to periods prior to the close of business of January 27, 1968, or which result from acts, omissions, or obligations of [the Armour entities] prior to such date*[.]

(Emphasis supplied.)

6

After U. S. Steel acquired the property, it performed operations including relocating a railroad trestle, tearing down the old sulfuric acid plant, installing three above-ground storage tanks, and building new offices, a settling pond, and roads. According to U. S. Steel's own historian of the property, Douglas Boyea, some of this demolition and construction "took up parts of the footprint of the old acid plant." During these activities, some or all of the piles of pyrite cinders that had been collected on the property before 1937 were necessarily disturbed. Although the extent of U.S. Steel's movement of the cinders remains hotly disputed, the cinders were eventually found to have been distributed over more than five acres of the property. In the areas where U. S. Steel had excavated soil and installed the three new storage tanks, the remediators described the cinders as "a layer four to eight inches thick, at depths ranging from two inches to two feet below ground surface."

In 1983, U. S. Steel sold the property to Albany Warehouse Company (AWC).[2] In 1999, AWC reported to the Georgia Department of Natural Resources that the soil and groundwater at the site contained lead and phosphorus. The Department soon notified Viad, U. S. Steel, and AWC that each was considered a "responsible party" under the Georgia Hazardous Site Response Act ("HSRA"), OCGA § 12-8-90 et seq.

_____

[2] AWC is no longer a party to this action.

7

Because Viad and U. S. Steel disagreed as to which of them bore responsibility for the remediation, they agreed to split the costs equally and to preserve their indemnification rights against each other. Remediation eventually cost over $2.9 million.

In 2006, U. S. Steel filed this action for indemnification, and Viad counterclaimed for the same. In 2010, the trial court appointed a special master and empowered him to rule on "all discovery[-]related matters and disputes between the parties." During discovery, U. S. Steel produced a document containing a handwritten summary of the contents of a box. The summary indicated that the box contained at least two documents from 1974 and 1983 concerning the property's "pollution problems." In March 2012, the special master orally granted Viad's motion to compel production of the box, including the documents identified in the summary, but did not enter an order to that effect before the deposition of Viad's expert, Dr. Andy Davis, in April 2012. After what it claimed was abusive behavior by U. S. Steel's counsel, Viad suspended the deposition of Davis and asked the special master to limit or terminate it. Despite the appointment of the special master, U. S. Steel filed a motion directly with the trial court asking for sanctions and to stay production of the box.

Months later, the trial court referred these disputes back to the special master and stayed discovery pending resolution of them.

In May 2014, with discovery still stayed, U. S. Steel filed a motion for summary judgment in the trial court on the grounds that Viad had either breached the indemnity provisions of the Sale Contract or was liable for common-law contribution. Viad responded to the motion, but also moved to lift the stay, to set a discovery deadline, and to postpone consideration of U. S. Steel's motion. Without ruling on the discovery dispute, and after examining only the Sale Contract, the trial court granted summary judgment to U. S. Steel. Although the court found that U. S. Steel's improvements to the property caused some of the contamination that was spread throughout the property, and pretermitting whether U. S. Steel was negligent in such conduct, the court held that Viad was nevertheless obligated to indemnify U. S. Steel because Viad's predecessors were "responsible for producing all of the contaminants that were found" on the property and because even "the spread of the contaminants actually arise[s] out of the actions and obligations" of Viad. This appeal followed.

1. Viad first argues that the trial court erroneously ignored the indemnity provisions of the Assumption Agreement, in which U. S. Steel agreed to take responsibility for liabilities arising from its own acts or omissions after purchasing

9

the property, and that Viad never expressly agreed to indemnify U. S. Steel for the consequences of U. S. Steel's own negligence. We agree.

> The interpretation of a contract is normally a question of law to be resolved by the court, and the orders of the lower court in this case are therefore subject to de novo review. This review requires us first to decide whether the contract provisions at issue are ambiguous. If there is no ambiguity, then we simply enforce the contract according to its terms.

*Willesen v. Ernest Communications*, 323 Ga. App. 457, 459-460 (1) (746 SE2d 755) (2013) (citations omitted). "If there is no ambiguity, then we simply enforce the contract according to its terms." *Firmani v. Dar-Court Builders*, 339 Ga. App. 413, 425 (4) (793 SE2d 596) (2016), citing *Willesen*, 323 Ga. App. at 459 (1).

"[T]he words of a contract of indemnification must be construed strictly against the indemnitee, and every presumption is against an intention to indemnify." *Firmani*, 339 Ga. App. at 425 (4) (citation and punctuation omitted). Accordingly, and as the Supreme Court of Georgia has held, we will not interpret "contractual indemnities [to] extend to losses caused by an indemnitee's own negligence unless the contract expressly states that the negligence of the indemnitee is covered." *Ryder Integrated*

*Logistics v. BellSouth Telecommunications*, 281 Ga. 736, 737-738 (642 SE2d 695) (2007).

Here, the parties agreed to the unambiguous and complementary indemnity provisions of the Assumption Agreement, which was their final expression on the subject before the discovery of contaminants at the site. Under Paragraph 1 (b) of the Assumption Agreement, U. S. Steel undertook to indemnify Viad for "[a]ll debts, liabilities, and obligations (actual or alleged) arising out of the ownership or operation of the Net Assets and business of [the Armour entities]," but only "to the extent that the same are attributable to the period after the close of business on the Closing Date and *arise from acts or omissions of [U.S. Steel] occurring after* the close of business on said date[.]" (Emphasis supplied.) In Paragraph 5 of the Assumption Agreement, Viad undertook to indemnify U. S. Steel for any claim or loss "*arising out of or resulting from*" liabilities of the Armour entities "which were *attributable to periods prior to* the close of business" on January 27, 1968, "or which result from acts, omissions, or obligations" of the Armour entities before that date. (Emphasis supplied.)

The phrase "arising out of" is construed relatively broadly under Georgia indemnity law: it "does not mean proximate cause in the strict legal sense, nor [does

it] require a finding that the injury was directly and proximately caused by the [indemnitor's] actions." *BBL-McCarthy, LLC v. Baldwin Paving Co.*, 285 Ga. App. 494, 498 (1) (a) (646 SE2d 682) (2007) (punctuation omitted). Rather, "[a]lmost any causal connection or relationship will do." Id. (punctuation omitted).

In this broad sense, it is conceivable that all environmental costs at the property "arose out of" the activities of Viad's predecessors because those predecessors produced the contaminants at issue. Nonetheless, the terms "arising from" or "arising out of" appear on both sides and apply to both parties to the Assumption Agreement, which organizes indemnification in simple and complementary terms. Reading Paragraphs 5 and 1 of the Assumption Agreement together "so as to harmonize" them with each other, as we are required to do, *Freeman v. Smith*, 324 Ga. App. 426, 435 (2) (750 SE2d 739) (2013), Viad was to be responsible for all claims "arising out of or resulting from" liabilities "attributable to periods *prior to*" January 1968, "or which result from acts, omissions, or obligations" of the Armour entities "prior to" that date, while U. S. Steel was to be responsible for all losses "arising out of" its "ownership or operation" of the property "to the extent the same are attributable to the period *after*" June 1968 and "arise from [its own] acts or omissions[.]" To conclude, as the trial court did, that only Viad is responsible for all losses "arising out

12

of" its predecessors' creation of the cinders thus ignores the parties' agreement that U. S. Steel was to be liable on an equally broad basis for losses "arising from" its own activities affecting this same material after it acquired the property.

Further, Georgia law provides that U. S. Steel may not claim indemnity for its own negligence unless the Assumption Agreement "expressly, plainly, clearly and unequivocally" provided that Viad would indemnify U. S. Steel to this extent. *Firmani*, 339 Ga. App. at 425 (4). The reason for the rule requiring clarity in clauses indemnifying a party for its own negligence is "to assure that people exercise due care in their activities for fear of liability, rather than act carelessly in the knowledge that indemnity insurance [or other contracts] will relieve them." *Allstate Ins. Co. v. City of Atlanta*, 202 Ga. App. 692, 693 (415 SE2d 308) (1992). An indemnity that is merely "implied" by other terms or circumstances is not sufficient. Id. Here, and although the Assumption Agreement's indemnity provisions refer to the "acts or omissions" of both parties, the terms "negligence" or "negligent" are never used, with the result that U. S. Steel cannot claim indemnity from Viad for all of U. S. Steel's acts or omissions associated with the pollutants at issue, including any negligent acts as to the pollutants committed after U. S. Steel's acquisition of the property.

13

A factfinder must determine the extent to which U. S. Steel is responsible for that portion of remediation costs incurred as a result of its negligent acts or omissions as to the pyrite cinders made after the closing date of the Assumption Agreement. We therefore reverse the grant of summary judgment to U. S. Steel to the extent that the trial court's ruling made Viad responsible for losses attributable to U. S. Steel's negligent acts or omissions after U. S. Steel acquired the property. *Allstate Ins. Co.*, 202 Ga. App. at 694 (reversing grant of summary judgment to a city on its cross-claim for "complete indemnification" when the insurance policy under which it made the claim was insufficiently clear and specific to warrant indemnity for the city's own negligence); *Fina*, 200 F3d at 270-272 (II) (B) (1) (b) (reversing a grant of summary judgment to indemnitee when provision failed to grant indemnity for that party's own negligence).

Apportionment between defendants in cases involving soil contamination "necessarily requires a fact-intensive, site-specific analysis." *PCS Nitrogen v. Ashley II of Charleston*, 714 F3d 161, 182 (III) (A) (4th Cir. 2013). Given the hotly disputed history of activities and contamination at this site, we leave the question of apportionment between Viad and U. S. Steel for further proceedings consistent with this opinion. See id. at 177-178 (II) (B) (1) (affirming a finding of CERCLA liability

14

against a previous owner of a contaminated property as "plausible in light of the record viewed in its entirety"); *Smith v. Branch*, 226 Ga. App. 626, 628-629 (2) (b) (487 SE2d 35) (1997) (where contamination caused by defendant before 1987 continued to migrate within the period of the applicable statute of limitations, a trial court erred in granting partial summary judgment on plaintiff's continuing trespass and nuisance claims).

2. In its motion for summary judgment below, U. S. Steel asserted that it deserved judgment not only for indemnity according to the provisions of the Sale Contract but also for contribution under both the relevant provision of the Hazardous Site Response Act, OCGA § 12-8-96.1,[3] as well as other Georgia law, including

---

[3] OCGA § 12-8-96.1 provides in relevant part:
(a) Each and every person who contributed to a release of a hazardous waste, a hazardous constituent, or a hazardous substance shall be jointly, severally, and strictly liable to the State of Georgia for the reasonable costs of activities associated with the cleanup of environmental hazards[.]
. . .
(e) During or following the undertaking of any corrective action, any person may seek contribution from any other person who has contributed or is contributing to any release of a hazardous waste, a hazardous constituent, or a hazardous substance. Such claims for contribution shall be governed by the law of this state. In resolving contribution claims, the court may allocate costs among liable parties using such equitable factors as the court determines to be appropriate.

15

OCGA § 51-12-32.[4] U. S. Steel now argues that we should affirm the trial court's

grant of summary judgment as "right for any reason raised below." See *McPherson*

*v. McPherson*, 307 Ga. App. 548, 550 (1) (705 SE2d 314) (2011) (citation omitted).

We disagree.

As U. S. Steel's own motion below acknowledges, contribution claims under

HSRA are "governed by the law of this state," and a trial court considering such

claims is entitled "[to] allocate costs among liable parties using such equitable factors

as the court determines to be appropriate." OCGA § 12-8-96.1 (e). As the Supreme

Court of Georgia has recently repeated, "a trial court has broad discretion to fashion

an equitable remedy based upon the exigencies of the case, and an appellate court

sustains the trial court's action where such discretion has not been abused." *Tafel v.*

*Lion Antique Cars & Investments*, 297 Ga. 334, 339 (4) (773 SE2d 743) (2015)

---

[4] OCGA § 51-12-32 provides in relevant part:
(a) . . . [W]here a tortious act does not involve moral turpitude, contribution among several trespassers may be enforced just as if an action had been brought against them jointly. Without the necessity of being charged by action or judgment, the right of a joint trespasser to contribution from another or others shall continue unabated and shall not be lost or prejudiced by compromise and settlement of a claim or claims for injury to person or property or for wrongful death and release therefrom.
(b) If judgment is entered jointly against several trespassers and is paid off by one of them, the others shall be liable to him for contribution.

(citation and punctuation omitted). Likewise, the question of a pro rata share of contribution claims as between joint tortfeasors is properly left to a factfinder when, as we have held in Division 1, a determination of the respective negligence of each party, if any, remains for further proceedings. See *Virginia Ins. Reciprocal v. Pilzer*, 278 Ga. 190, 191 (599 SE2d 182) (2004) (under OCGA § 51-12-32 (b), a defendant is entitled to contribution from a co-defendant "when . . . [a] judgment has been entered against both *and that [judgment] has actually been paid by one in an amount exceeding his pro rata share*") (citation and punctuation omitted; emphasis supplied).

As above, then, we decline to resolve these factual issues or to interfere with the trial court's equitable powers at this stage of the proceedings. On remand, the parties' discovery disputes also remain pending before the special master and the trial court.

*Judgment reversed in part and vacated in part, and case remanded with direction. McFadden, P. J., and Bethel, J., concur*.